969 A.2d 536

**Peter DePAUL, Petitioner**

v.

**COMMONWEALTH of Pennsylvania and the Pennsylvania Gaming Control Board, Respondents.**

Supreme Court of Pennsylvania.

Argued May 13, 2008.

Decided April 30, 2009.

David James Porter, John Robert Leathers, Thomas L. Van Kirk, Thomas Patrick Manning, Howard D. Scher and Landon Young Jones, III Buchanan Ingersoll & Rooney, P.C., Pittsburgh, for Peter DePaul.

Calvin Royer Koons, Thomas W. Corbett, Jr., Office of Attorney general, for Com.

Francis T. Donaghue, Gaming Control Board, Calvin Royer Koons, Office of Attorney General, for Pennsylvania Gaming Control Board.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Chief Justice CASTILLE.

Petitioner, Peter DePaul, has filed a verified petition in the nature of a complaint seeking declaratory judgment and injunctive relief, challenging the constitutionality of Section 1513 of the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. § 1513 ("Gaming Act").[1] Section 1513 imposes upon a class of individuals affiliated with licensed gaming in Pennsylvania an absolute ban on political contributions to any candidate for public office in the Commonwealth, to any political party committee in the Commonwealth, or to any group or association organized in support of a candidate in the Commonwealth. DePaul claims that the ban is unconstitutional, both facially and as applied to him, because it is an overly broad and unlawfully discriminatory infringement of the rights to free expression and association guaranteed by Article I, Sections 7, 20, and 26 of the Pennsylvania Constitution. For the reasons that follow, we agree with DePaul's essential premise. Accordingly, we hold that Section 1513 is unconstitutional under Article I, Section 7, to the extent that it prohibits political contributions of any amount by specified individuals involved in the gaming industry, and we enjoin the enforcement of this unconstitutional provision.[2]

1. This constitutional challenge lies within the exclusive jurisdiction of this Court pursuant to Section 1904 of the Gaming Act, which provides:

 The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of this part. The Supreme Court is authorized to take such action as it deems appropriate, consistent with the Supreme Court retaining jurisdiction over such a matter, to find facts or to expedite a final judgment in connection with such a challenge or request for declaratory relief.

 4 Pa.C.S. § 1904. "The 'part' referred to in Section 1904 is the entirety of the Gaming Act." *State Troopers Ass'n v. Commonwealth*, 591 Pa. 561, 920 A.2d 173, 176 n. 8 (2007).

2. Our finding that Section 1513 is unconstitutional does not call into question the validity of the remaining provisions of the Gaming Act. *See*

Since December of 2005, DePaul has held a 13.63% ownership interest in Washington Philadelphia Investors, LP, which, in turn, holds a 70% ownership interest in Philadelphia Entertainment and Development Partners ("PEDP"), owners of the planned "Foxwoods" Casino.[3] DePaul states that he holds a 9.54% indirect ownership interest in PEDP.[4] On December 20, 2006, the Gaming Control Board approved PEDP's application for a Category 2 slot machine license in Philadelphia and issued its formal Order and Adjudication on the Philadelphia slot machine licenses on February 1, 2007. Following an appeal by an unsuccessful candidate challenging the Board's licensing decision, this Court affirmed the Board's Order and Adjudication on July 17, 2007. *Riverwalk Casino v. Pa. Gaming Control Bd.*, 592 Pa. 505, 926 A.2d 926 (2007).

Concurrently with PEDP's application for a Category 2 slot machine license, DePaul applied to the Board for a gaming license as a "key employee qualifier" of PEDP. Thereafter, and effective November 1, 2006, the Gaming Act was amended, and the term "key employee qualifier" was replaced with the term "principal."[5] It is undisputed that DePaul qualifies as a principal under the Gaming Act. Section 1513(a) of the Act, which is entitled "Political influence," among other things, absolutely "prohibit[s]" principals, along with other classes of

*Commonwealth v. Mockaitis*, 575 Pa. 5, 834 A.2d 488, 502 (2003) (individual provisions of statutes are presumptively severable).

3. The facts set forth in this Opinion are largely gleaned from the undisputed allegations in DePaul's verified petition.

4. The Office of the Attorney General asserts that this 9.54% interest is a controlling rather than an indirect interest.

5. The Gaming Act defines a principal as:

An officer; director; person who directly holds a beneficial interest in or ownership of the securities of an applicant or licensee; person who has a controlling interest in an applicant or licensee, or has the ability to elect a majority of the board of directors of a licensee or to otherwise control a licensee; lender or other licensed financial institution of an applicant or licensee, other than a bank or lending institution which makes a loan or holds a mortgage or other lien acquired in the ordinary course of business; underwriter of an applicant or licensee; or other person or employee of an applicant, slot machine licensee, manufacturer licensee or supplier licensee deemed to be a principal by the Pennsylvania Gaming Control Board.

4 Pa.C.S. § 1103.

individuals involved in the gaming business, from "contributing **any** money or in-kind contribution to a candidate for nomination or election to **any** public office in this Commonwealth, or to **any** political party committee or other political committee in this Commonwealth or to **any** group, committee or association organized in support of a candidate, political party committee or other political committee in this Commonwealth." 4 Pa.C.S. § 1513(a) (emphasis added).[6] DePaul's constitutional challenge focuses on this broad prohibition.

During his entire adult life, DePaul asserts that he has actively supported candidates for public office in Pennsylvania, from governor to township supervisor, who, in his opinion, would serve the best interests of the Commonwealth. DePaul asserts that between January 13, 2006 and April 21, 2006, while PEDP's and his own license applications were pending, he was unaware that Section 1513's absolute ban applied to individuals who held any ownership interest, even an indirect ownership interest, in a slots license applicant such as PEDP.

6. Section 1513(a) reads as follows:
> (a) **Contribution restriction.**—The following persons shall be prohibited from contributing any money or in-kind contribution to a candidate for nomination or election to any public office in this Commonwealth, or to any political party committee or other political committee in this Commonwealth or to any group, committee or association organized in support of a candidate, political party committee or other political committee in this Commonwealth:
> (1) An applicant for a slot machine license, manufacturer license, supplier license, principal license, key employee license or horse or harness racing license.
> (2) A slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.
> (3) A licensed principal or licensed key employee of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.
> (4) An affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.
> (5) A licensed principal or licensed key employee of an affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.
> (6) A person who holds a similar gaming license in another jurisdiction and the affiliates, intermediaries, subsidiaries, holding companies, principals or key employees thereof.
> 4 Pa.C.S. § 1513(a).

Thus, during that time period, DePaul made 21 political contributions totaling $31,745, including donations to State Representatives John Taylor and George Kenney, Jr., the Republican Committees for Bucks and Montgomery Counties, Montgomery County District Attorney Bruce Castor, Jr., and Philadelphia Register of Wills Ronald Donatucci.

On May 9, 2006, DePaul first learned that Section 1513's ban applied to applicants for key employee qualifier licenses and individuals who own indirect ownership interests in license applicants. DePaul promptly contacted the candidates and organizations to rescind his contributions and reported making the contributions and their rescission to the Gaming Control Board. On June 15, 2006, DePaul received an inquiry from the Board's Bureau of Investigations and Enforcement ("BIE").[7] DePaul responded on June 21, 2006, informing BIE that all contributions had been refunded to him. BIE and DePaul then entered into negotiations regarding a consent decree. On December 4, 2006, the Board approved a consent decree entered into by DePaul, PEDP and the Board. The consent decree provided that, based upon DePaul's apparent violation of Section 1513(a)'s total ban on contributions, DePaul and PEDP would each pay $100,000 to the Commonwealth. The decree also set forth procedures and requirements designed to ensure DePaul's and PEDP's future compliance with Section 1513.

Due to DePaul's continued desire to make political contributions and attend political events such as dinners, receptions and candidate meetings, all of which require a purchased ticket to attend, he filed a verified petition seeking a declaration that Section 1513 is unconstitutional under the Pennsylvania Constitution because it violates his inherent rights of political expression and association, and requesting an order enjoining the enforcement of Section 1513. As noted, this Court possesses exclusive jurisdiction over this constitutional

7. Section 1517(a) of the Act established "a Bureau of Investigations and Enforcement which shall be independent of the board in matters relating to enforcement of this part." 4 Pa.C.S. § 1517(a).

challenge to a provision of the Gaming Act pursuant to 4 Pa.C.S. § 1904.

Broadly stated, Count I of DePaul's verified petition contends that political contributions represent speech and association protected by Article I, Sections 7 and 20 of the Pennsylvania Constitution, which, he states, provide broader protections for freedom of speech and association than do their counterparts in the United States Constitution. In support of this contention, DePaul cites to *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 605 (2002) (*"Pap's II "*) (Article I, Section 7 provides broader protection for freedom of expression than First Amendment of federal constitution), and *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382, 1387 (1981) (state constitutional rights may be more expansive than federal counterparts). DePaul claims that, in order to pass constitutional muster, an absolute ban on political contributions must be "narrowly tailored" and must serve a compelling government interest, citing *Commonwealth v. Wadzinski*, 492 Pa. 35, 422 A.2d 124, 130 (1980), a First Amendment case in which this Court applied strict scrutiny. DePaul submits that Section 1513's ban does not pass this test.

Regarding the specifics of Section 1513's ban, DePaul notes that Section 1102 of the Gaming Act reflects a legislative intent to "prevent the actual or appearance of corruption that may result from large campaign contributions," and emphasizes the word "large." Section 1513, however, bans all contributions, regardless of amount, thereby depriving a potential contributor of his freedom of political association. DePaul further claims that Section 1513 is overly broad because it prohibits contributions to candidates for office even where there is no connection between the candidate and licensed gaming. DePaul cites as an example of the disconnection his contribution to a candidate for the Philadelphia Register of Wills, which he characterizes as "a political office without the least remote connection to the regulation of licensed gambling in the Commonwealth." Verified Petition, ¶ 41. DePaul also contends that the General Assembly imposed Section 1513's ban without a scintilla of evidence suggesting a connection in

Pennsylvania between licensed gaming, contributions to political candidates, and political corruption. Therefore, in De-Paul's view, the Legislature failed to identify any compelling governmental interest that would support Section 1513's invasive limitation on constitutional rights of free speech and political association.

In Count II of the petition, DePaul claims that Section 1513 violates Article I, Section 26 of the Pennsylvania Constitution, which establishes prohibitions on unlawful or baseless discrimination against persons in their exercise of civil rights. De-Paul contends that Section 1513 unlawfully and irrationally discriminates against persons having a broad range of associations to licensed gaming, denying them the right to participate in the political process. The outright ban, he alleges, will not enhance the comprehensive regulatory safeguards built into the Gaming Act and is inconsistent with the federal and state commitment to permit all persons to participate actively in the democratic process.[8]

Turning to the current briefing, we begin with DePaul's claim that Section 1513 violates Article I, Section 7 of our Constitution, which provides:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. **The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.** No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter

---

8. DePaul also states in his verified petition that political contributions are independently protected by Article I, Section 20, which provides: "The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance." This argument is not developed individually by DePaul, but instead is subsumed within his argument related to Article I, Section 7. Therefore, we will not address the argument separately.

proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

PA. CONST. art. I, § 7 (emphasis added). DePaul notes that, when a party mounts an individual rights challenge under the Pennsylvania Constitution, the party should undertake an independent analysis such as was suggested in this Court's seminal decision in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). "*Edmunds* directs advocates to brief and analyze the following four factors when litigating a claim that state constitutional doctrine should depart from the applicable federal standard: (1) the text of the provision of the Pennsylvania Constitution; (2) the history of the provision, including the caselaw of this Commonwealth; (3) relevant caselaw from other jurisdictions; and (4) policy considerations, 'including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.' " *Commonwealth v. Sam*, 597 Pa. 523, 952 A.2d 565, 585 (2008) (quoting *Edmunds*, 586 A.2d at 895). DePaul contends that this Court's opinion in *Pap's II* already provides a thorough *Edmunds* analysis of the text and history of Article I, Section 7, making it unnecessary to undertake an analysis of the first two *Edmunds* factors here. *See Pap's II*, 812 A.2d at 603–10.

DePaul then argues that it is settled law that political contributions constitute expressive conduct protected by Article I, Section 7, and that contribution and expenditure limitations for political campaigns implicate the fundamental freedoms of political expression and political association. DePaul cites to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and *Randall v. Sorrell*, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) for the latter proposition. Section 1513, he contends, constitutes the most severe of restrictions on the ability to contribute to any political candidate or party in Pennsylvania by any individual who holds or has applied for a gaming license in Pennsylvania or in another

jurisdiction, or who is a principal in such a gaming concern. DePaul claims that Section 1513's ban on political contributions is far broader than the contribution limitation upheld in *Buckley*, which merely restricted the amount of an individual's contribution, without barring contributions entirely. DePaul further notes that the *Buckley* decision has led to conflicting federal constitutional authority regarding the level of scrutiny to be applied to restrictions on political contributions.

No such conflict exists in Pennsylvania, according to De-Paul. This is so because *Pap's II* suggests that this Court should apply a strict scrutiny standard where the restriction (here, a statute) is on expressive conduct. In *Pap's II*, this Court applied strict scrutiny to an ordinance which totally banned nudity in the City of Erie in any public place, holding that restrictions on expression or expressive conduct are subject to strict scrutiny when challenged under Article I, Section 7. Even if *Pap's II* did not explicitly establish that strict scrutiny applies to restrictions on political contributions, De Paul notes that the Court in that case certainly declined to apply an intermediate level of scrutiny to an Article I, Section 7 challenge due, in part, to the fact that the U.S. Supreme Court had been unable to reach a majority consensus respecting the level of scrutiny to be applied in similar federal challenges. Likewise, DePaul claims, the Supreme Court's decision in *Buckley* resulted in disagreement over the level of scrutiny that should apply to cases involving limitations on campaign contributions.[9] Given the similarity in circum-

9. According to DePaul, although the per curiam opinion in *Buckley* applied a strict scrutiny test, various Justices have questioned whether the High Court actually applies strict scrutiny when analyzing contribution limits. *See Buckley*, 424 U.S. at 245, 96 S.Ct. 612 (Burger, C.J., concurring and dissenting) (Court espouses strict scrutiny test but then forsakes strict scrutiny analysis by finding that Congress was "entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption"); *Randall v. Sorrell*, 548 U.S. 230, 264, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (Kennedy, J., dissenting) (Court has upheld campaign contribution limitations that "do 'not even come close to passing any serious scrutiny' ") (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 410, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)); *Randall*, 548 U.S. at 267, 126 S.Ct. 2479 (Thom-

stances, DePaul argues, this Court should reach the same conclusion that it reached in *Pap's II*, which is that strict scrutiny applies to Article I, Section 7 challenges to restrictions on political expression.

DePaul next posits that Section 1513 cannot survive strict scrutiny because it is not narrowly drawn to accomplish a compelling state interest, as required by *Pap's II*. The Gaming Act, according to DePaul, was enacted without any investigation regarding whether the gaming industry, which is heavily regulated, posed any risk of political corruption or would be subject to any undue influence by individuals making political contributions. Thus, he concludes, there is no legislative record to support a compelling state interest in preventing actual corruption or the appearance of corruption arising from any and all political contributions. DePaul also takes issue with the Commonwealth's suggestion in its answer to the verified petition that the General Assembly could rely on the reported experience of other states with legalized gambling rather than creating a record of its own to support Pennsylvania's outright ban on political contributions. Specifically, DePaul points to the nineteen states other than Pennsylvania that have some form of legalized gaming or "racinos," only five of which have sought to ban political contributions from individuals involved in the gaming industry.[10][11]

as, J., concurring) ("I would overrule *Buckley* and subject both the contribution and expenditure restrictions of Act 64 to strict scrutiny, which they would fail."). The question of whether the U.S. Supreme Court truly requires, and employs, strict scrutiny in this area proves academic for, as we explain below, the test under Article I, Section 7 requires a strict scrutiny analysis.

**10.** The list of nineteen states DePaul cites does not include those with only tribal casinos, lotteries, pari-mutuel wagering, or charitable gaming.

**11.** DePaul cites to Indiana, Iowa, Louisiana, Michigan and New Jersey statutes banning political contributions by persons involved in the gaming industry. By contrast, he notes that Colorado, Delaware, Florida, Illinois, Maine, Mississippi, Missouri, Nevada, New Mexico, New York, Oklahoma, Rhode Island, South Dakota and West Virginia place no such bans. The City of St. Louis, Missouri, however, enacted an ordinance in 1995 prohibiting a holder of a gambling license from contributing to candidates for local office.

DePaul contends that, even if there is a compelling government interest in limiting or prohibiting political contributions from individuals involved in the gaming industry, Section 1513 is not narrowly tailored to further that interest. Specifically, DePaul argues that there are less intrusive means of serving the identified governmental interest of preventing corruption, given that Section 1513's ban is absolute and applies to all contributions regardless of the amount or whether the contributor is the licensee. DePaul suggests that there are obvious, less intrusive alternatives, such as imposing a limit on the amount of contributions, that would further the legislative intent while preserving the affected citizen's right to participate in political activity. In contrast, DePaul maintains, Section 1513 entirely deprives an individual involved in the gaming industry of the freedom of political association. Further, DePaul argues that Section 1513's ban is overly broad because it prohibits contributions even where there is no connection between the recipient political candidate or association and the gaming industry.

For similar reasons, DePaul claims that Section 1513 violates the equal protection and non-discrimination clauses of the Pennsylvania Constitution (Article I, Sections 1 and 26) because it impinges on the fundamental right of freedom of expression. As such, DePaul urges this Court to apply strict scrutiny, a test which Section 1513 cannot survive because it is not narrowly tailored to serve a compelling state interest. Finally, DePaul argues that, even if this Court were to apply intermediate or heightened scrutiny, Section 1513 does not serve "important governmental interests" and "the discriminatory means employed" via the total ban are not "substantially related to the achievement of those objectives," citing *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 728, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). This is so, DePaul argues, because the General Assembly failed to compile a record of evidence to justify an absolute ban on political contributions.

The Commonwealth argues in response that, while the right to make political contributions implicates Article I, Section 7,

that right is not absolute and may be limited by appropriate legislation. The Commonwealth does not engage in an *Edmunds* analysis, except to suggest that *Pap's II's* holding that Article I, Section 7 offered broader protection of expression than the First Amendment does not mean that relevant First Amendment decisions of the U.S. Supreme Court and other jurisdictions on the issue of limitations on political contributions lose their instructive value. In the Commonwealth's view, these decisions, which "grappled with similar issues . . ., have sensible things to say about speech and association that can be helpful to the Court." Brief for Respondent at 10. Citing to *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), and *Buckley,* the Commonwealth notes that the U.S. Supreme Court has found that limitations on the amount of money persons or groups may contribute do not substantially impair their right of free expression, so long as the government demonstrates that the contribution regulation was closely drawn to match a sufficiently important governmental interest.

The Commonwealth recognizes that its compelling government interest/narrowly drawn statute paradigm is substantially the same as *Pap's II's* strict scrutiny test. But, the Commonwealth argues, this statute survives such scrutiny. The Commonwealth maintains that the interest at issue is the prevention of public corruption and/or the appearance of public corruption that could result from permitting gaming licensees and highly placed gaming personnel to contribute to political parties, committees and candidates for public office, as well as maintaining public confidence in the proper regulation of the gaming industry. Again citing to *Nixon,* the Commonwealth claims that the Supreme Court there found limits on contributions to candidates for public office to be constitutional, recognizing the equal concerns of corruption and the impact of the appearance of corruption as both potentially affect public confidence in our system of government. 528 U.S. at 388–89, 120 S.Ct. 897. Those concerns, according to the Commonwealth, are present here where high-

level participants in the gaming industry could contribute to the very public officials charged with the ultimate regulation of their industry.

The Commonwealth looks to decisions from other jurisdictions considering federal First Amendment challenges that have found the government interest in banning contributions by certain individuals involved in the gaming industry to be compelling. *See Petition of Soto,* 236 N.J.Super. 303, 565 A.2d 1088 (App.Div.1989), *certif. denied,* 121 N.J. 608, 583 A.2d 310 (1990), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990) (compelling government interest); *Casino Ass'n of La. v. State ex rel. Foster,* 820 So.2d 494 (La.2002) (sufficiently important government interest). Further, the Commonwealth argues, it was unnecessary for the General Assembly to compile its own legislative findings respecting the important governmental interest at issue because other jurisdictions have generated studies on the same question, and the U.S. Supreme Court has found the experience of other jurisdictions to be relevant in evaluating freedom of expression challenges. Brief for Respondent at 9, (citing *Pap's A.M. v. City of Erie, supra* ). The Commonwealth also notes that the link between the gaming industry and public corruption or the appearance of corruption is not novel. Thus, in *Soto,* the New Jersey Appellate Division found a compelling state interest in New Jersey's blanket ban on political contributions by those involved in the gaming industry based upon "a longstanding and strong sensitivity to the evils traditionally associated with casino gambling when it is unregulated, and even when there is regulation, there is a continued sensitivity to the maintenance of the integrity of the process, and in particular, the regulatory process." *Soto,* 565 A.2d at 1093.

The Commonwealth also asserts that Section 1513's outright ban is narrowly drawn to further the government interest of preventing corruption or the appearance of corruption in the regulation of the gaming industry. Section 1513, according to the Commonwealth, does not reach conduct more traditionally regarded as speech, such as joining political committees and groups, participating in their activities, or speaking on public

issues in support of candidates. The Commonwealth cites to *Schiller Park Colonial Inn, Inc. v. Berz,* 63 Ill.2d 499, 349 N.E.2d 61 (1976), where the Illinois Supreme Court sustained against a First Amendment challenge a state law prohibiting political contributions by liquor licensees, their agents or employees. That court rejected the same overbreadth argument now advanced by DePaul and found that it did not matter that the statute prohibited both large and small contributions. The *Berz* court reasoned that the Illinois Legislature may have believed that its efforts to further state interests in preventing corruption would have been less effective if only contributions above a specific dollar amount were prohibited. *Id.* at 66. Further, the court noted that the purpose of the law could be circumvented by licensees who financed a large number of small contributions. The Commonwealth argues that the same danger exists respecting contributions by individuals involved in the Pennsylvania gaming industry. The Commonwealth adds that the Illinois high court also rejected the argument that contributions to candidates who have no connection to gaming regulation should not be prohibited, finding that a public officer may wield power or influence beyond that which is inherent in his official duties. *Id.* at 67.

Finally, the Commonwealth argues that the Gaming Act does not discriminate against casino licensees or principals, etc. Because the test for an equal protection claim is essentially the same as a free speech claim—whether there is a compelling state interest and the law is narrowly drawn to serve that interest—the Commonwealth contends that Section 1513 survives attack under both Article I, Section 7 and Article I, Section 26.

It is axiomatic that: "[A]ny party challenging the constitutionality of a statute must meet a heavy burden, for we presume legislation to be constitutional absent a demonstration that the statute 'clearly, palpably, and plainly' violates the Constitution." *Konidaris v. Portnoff Law Associates, Ltd.,* 598 Pa. 55, 953 A.2d 1231, 1239 (2008) (citation omitted). The presumption that legislative enactments are constitutional is strong. *Commonwealth v. McMullen,* 599 Pa. 435, 961 A.2d

842, 846 (2008); *see also* 1 Pa.C.S. § 1922(3) (in ascertaining intent of General Assembly in enactment of statute, presumption exists that General Assembly did not intend to violate federal and state constitutions). All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383, 393 (2005). Moreover, "statutes are to be construed whenever possible to uphold their constitutionality." *In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1231 (1978). With these general principles in mind, we turn to the merits of the constitutional question at issue in this appeal.

■ *Pap's II* emphasized that the history of Article I, Section 7 in Pennsylvania is deep and the protections afforded freedom of expression by that provision longstanding:

The protections afforded by Article I, § 7 thus are distinct and firmly rooted in Pennsylvania history and experience. The provision is an ancestor, not a stepchild, of the First Amendment. Nor did Pennsylvania's protection of freedom of expression remain dormant until the First Amendment became applicable to the states. In addition to the fact that we must assume that Pennsylvania legislators, executives, and judges were all true to their oaths of fidelity to our Constitution, and thus were careful to guard against encroachment, this Court has not been hesitant to act to ensure these fundamental rights.

812 A.2d at 605. This Court has found that Article I, Section 7 provides broader protections of expression than the related First Amendment guarantee in a number of different contexts. *See id.* at 611–12 (nude dancing entitled to greater protection under Pennsylvania Constitution); *Commonwealth, Bureau of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 728 A.2d 340, 343–44 (1999) (commercial speech in form of advertising by chiropractors entitled to greater protection so long as not misleading); *Ins. Adjustment Bureau v. Ins. Comm'r*, 518 Pa. 210, 542 A.2d 1317, 1324 (1988) (Article I, Section 7 does not allow prior restraint or other restriction of commercial speech by governmental agen-

cy where legitimate, important interests of government may be accomplished in less intrusive manner); *Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382, 1391 (1981) (political leafleting on college campus deemed protected expression under Article I, Section 7 where First Amendment may not protect same); *Goldman Theatres v. Dana,* 405 Pa. 83, 173 A.2d 59, 64 (1961), *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961) (statute providing for censorship of motion pictures, while not necessarily violative of First Amendment, violates Article I, Section 7).

*Pap's II* also made clear that, when protected expression is at issue, strict scrutiny is the appropriate measure of a governmental restriction:

> We also independently hold, pursuant to Article I, § 7, that an intermediate level of scrutiny, such as is set forth in [*United States v.*] *O'Brien,* [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)], is inappropriate where expressive conduct such as the nude dancing at issue here is involved. Our experience in this case convinces us of the wisdom of our observations in *Insurance Adjustment Bureau [v. Insurance Commissioner,* 518 Pa. 210, 542 A.2d 1317 (Pa. 1988),] of the perils in the intermediate scrutiny test when protected expression is at issue. We conclude that regulations aimed at barring nude dancing, no less than regulations of protected commercial speech, require that we "tread carefully where restraints are imposed ... if there are less intrusive, practicable methods available to effect legitimate, important government interests." 542 A.2d at 1324. Although the expression at issue here is not political speech (as it is not in the commercial speech arena), nevertheless we are satisfied that it is communication within the contemplation of Article I, § 7. It is hardly onerous to require that a regulation that would seek to govern such expression, offered in a closed establishment to consenting adult patrons, be accomplished by a narrower, less intrusive method than the total ban on expression adopted here.

*Id.* at 612; *see also In re Condemnation by Urban Redevelopment Auth. of Pittsburgh,* 590 Pa. 431, 913 A.2d 178, 189

(2006) ("The *Pap's II* court decreed that whenever the government acts to effect such a complete ban on a certain type of expression, strict scrutiny must be applied regardless of whether the government's action was content-based."). Given this Court's extensive consideration of Article I, Section 7 under the *Edmunds* factors in *Pap's II*, and the fact that the Commonwealth does not dispute that the appropriate state constitutional test in this arena is strict scrutiny, there is no reason to engage in a full-blown *Edmunds* analysis here.

 Preliminarily, we note that this Court has never explicitly addressed the question of whether political contributions constitute protected expression. The Commonwealth, however, does not dispute that the answer is affirmative, *see* Brief for Respondent at 9 ("DePaul's political contributions clearly implicate a right under Article I, § 7"), and we have no doubt that protected expression is implicated. In this regard, we note our agreement with the Commonwealth's argument that reference to First Amendment authority remains instructive in construing Article I, Section 7, and the First Amendment cases waste little time in concluding that limitations upon political contributions implicate freedom of expression. Thus, in its discussion of the effect of limitations on the size of contributions, the U.S. Supreme Court in *Buckley* noted:

> **A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.** At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

*Buckley*, 424 U.S. at 20–21, 96 S.Ct. 612 (emphasis added).[12, 13] Subsequent decisions of the High Court have recognized that limitations on campaign contributions implicate First Amendment expression rights. *See Randall v. Sorrell*, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). For purposes of Article I, Section 7, we agree that political contributions are a form of non-verbal, protected expression. While such indirect expressions of view may not implicate the same heightened value as pure speech, it is also significant where the indirect expression being targeted is political. Accordingly, we hold that the instant legislative restriction upon the expressive conduct represented by political donations is subject to strict scrutiny.

We agree with the Commonwealth that consideration of the experience of other jurisdictions considering similar restrictions on expression may be helpful in assessing the importance of the asserted governmental interest and the relationship between the governmental interest itself and the means of advancing that interest. DePaul identifies nineteen states, in addition to Pennsylvania, with some form of legalized casino gambling, a number which does not include those states with only tribal casinos, lotteries, pari-mutuel wagering, or charitable gaming. There are eleven states (plus Pennsylvania) with commercial casinos: Colorado, Illinois, Indiana, Iowa, Louisiana, Michigan, Mississippi, Missouri, Nevada, New Jersey, and South Dakota. Three of those states (Indiana, Iowa, Louisiana), like Pennsylvania, have approved "racinos"[14] as

12. The *Buckley* Court went on to note that contribution and expenditure limitations—which were the restrictions at issue in that case, not outright bans, as here—"also impinge on protected associational freedoms. Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." *Id.* at 22, 96 S.Ct. 612.

13. *Buckley* was a *per curiam* decision, accompanied by five concurring and dissenting opinions (by Chief Justice Burger and Justices White, Marshall, Rehnquist and Blackmun); but notably, none of the responsive opinions addressed or disagreed with the notion that a political contribution constitutes expressive conduct.

14. A "racino" is a combined racetrack and casino.

well as commercial casinos. The other eight states authorize racinos only: Delaware, Florida, Maine, New Mexico, New York, Oklahoma, Rhode Island, and West Virginia.

The vast majority of these nineteen states—fourteen: Colorado, Delaware, Florida, Illinois, Maine, Mississippi, Missouri, Nevada, New Mexico, New York, Oklahoma, Rhode Island, South Dakota and West Virginia—do not regulate political contributions by individuals involved in the gaming industry.[15] The remaining five states have statutes banning specified individuals associated with the gaming industry from making political contributions in any amount. However, these states take different approaches concerning which people involved in the industry are subject to the total ban on political contributions.

Three of the states with Indiana, Iowa and Louisiana—are similar to Pennsylvania in that they have both commercial casinos and racinos, while the other two, Michigan and New Jersey, permit only commercial casinos. Indiana targets a fairly narrow spectrum of people—owners, officers in a corporate entity with an ownership interest or licensees of a gaming entity—and prohibits contributions to candidates for state or local office and committees organized by a candidate, political party or legislative caucus of the state house or senate. Ind.Code § 4–33–10–2.1. Michigan's ban is broader, as it covers licensees (and spouses, children and spouses of children) as well as officers, persons with an ownership interest or managerial employees of a licensee or casino enterprise. Michigan prohibits such persons from contributing to a candidate, political party committee, independent committee or legislative caucus committee. Mich. Comp. Laws § 432.207b. Iowa has a much narrower ban, as it applies only to riverboat

15. As for forms of gambling other than casino gaming, Illinois bans contributions by licensees, officers, directors and owners involved in pari-mutuel wagering, but not commercial casino licensees. 230 Ill. Comp. Stat. 5/24. Virginia does not permit any licensed owner or operator of a pari-mutuel wagering establishment or any officer, director, partner, spouse or immediate family member to make political contributions. Va.Code Ann. § 59–1–375. Nebraska prohibits lottery contractors from making political contributions. Neb.Rev.Stat. § 49–1476.01.

gambling corporate licensees, and bans them from making contributions "to a candidate, political committee, candidate's committee, state statutory political committee, county statutory political committee, national political party, or fund-raising event." Iowa Code § 99F.6. New Jersey targets a narrow class of persons for its contribution ban. New Jersey's restriction encompasses applicants and holders of casino licenses and any holding, intermediary or subsidiary company of a licensee or applicant, as well as officers or directors and key or principal employees of a casino licensee or applicant or holding, intermediary or subsidiary company. N.J. Stat. Ann. § 5:12–138. Finally, Louisiana has the most comprehensive ban, as it encompasses casino and riverboat licensees, distributors/suppliers or manufacturers of gaming devices, any person who owns a casino or riverboat in or on which gaming activities are licensed, and any person who owns a direct or indirect interest in a casino or riverboat and any officer, director, trustee, partner, or senior management level employee or key employee of a licensee. All such persons are prohibited from contributing to a candidate or political committee. La.Rev.Stat. Ann. § 18:1505.2.

Of the five states that absolutely ban political contributions by gaming licensees and varying other individuals involved in the gaming industry, only two have produced appellate court decisions on the constitutionality of the bans: both the Supreme Court of Louisiana and the New Jersey Superior Court, Appellate Division, upheld the bans in the face of First Amendment challenges. Before considering those decisions, we note that the New Jersey ban would not apply to a person such as DePaul, who is neither the licensee, nor a casino officer, director, holding company or subsidiary, nor a key or principal employee of a casino, holding company or subsidiary. Rather, he is an individual who owns an interest in a business concern that owns an interest in the ownership of a planned casino. The Louisiana ban, on the other hand, would cover DePaul, as it targets those who hold interests, either direct or indirect, in companies that own casinos.

In the Louisiana case, *Casino Association of Louisiana v. State ex rel. Foster*, the plaintiffs filed a declaratory judgment action seeking a determination that Louisiana's statutory and regulatory scheme prohibiting campaign contributions was unconstitutional because it violated the First Amendment. The trial court agreed and declared the statutes and regulations to be unconstitutional. On appeal, the state Supreme Court reversed, finding that the statutory ban passed federal constitutional muster:

> Restrictions on campaign contributions operate in an area protected by the First Amendment, particularly the right of freedom of association. However, a campaign contribution restriction, including a complete ban on campaign contributions, can withstand constitutional scrutiny if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. Thus, under *Buckley* and its progeny, we find that the campaign contribution restrictions on the riverboat and land-based casino gaming industries are closely drawn to match a sufficiently important interest in that they focus precisely on the problem of campaign contributions by the gaming industry—the narrow aspect of political association where the actuality and potential for corruption have been identified—while leaving such persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a substantial extent in supporting candidates and committees by making independent expenditures. Therefore, we find that the provisions of La. R.S. 18:1505.2(L) which prohibit riverboat and land-based casino gaming interests from making campaign contributions to candidates or to political committees of candidates do not violate the First Amendment.

820 So.2d at 509 (footnotes omitted). Thus, the Louisiana Supreme Court upheld a total ban on contributions by a broad group of individuals with interests in gaming, a group that would include investors such as DePaul.

In *In re Petition of Soto,* the New Jersey Superior Court, Appellate Division, likewise found that the state's ban on political contributions survived a First Amendment challenge because the statute served the compelling state interest in eliminating corruption in the gaming industry. The *Soto* court considered a more tailored statutory ban than the *Foster* court—at issue was the restriction applying to "casino key employees"—and in its constitutional analysis, the *Soto* court emphasized that the ban was narrowly drawn:

We are satisfied that § 138 has been narrowly drawn and precisely tailored to serve the compelling interest of the State. § 138 **is applicable only to casino key employees, who are defined as persons in a supervisory capacity or empowered to make discretionary decisions which regulate casino operations.** N.J.S.A. 5:12–9. Such a **select prohibition** is more than justified by the overriding interest in protecting the governmental process from the infiltration of the casino influence. As previously noted, we should not "second-guess" the Legislature's judgment.

*Id.* at 1100 (emphases added) (footnote omitted).

██ Both the Louisiana and New Jersey courts applied a First Amendment strict scrutiny standard, and both courts ultimately concluded that the statute at issue was narrowly tailored to meet a compelling state interest. This Court applies the same basic test to challenges under Article I, Section 7—in order to pass strict scrutiny for Article I, Section 7 purposes, a statute must be "narrowly drawn to accomplish a compelling governmental interest." *Pap's II,* 812 A.2d at 596 (citing *Pap's A.M. v. City of Erie,* 553 Pa. 348, 719 A.2d 273 (1998) (*"Pap's I "*) and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). That this Court applies the same test, however, does not dictate that the result will be the same.

Like the courts in *Foster* and *Soto,* we have little doubt that legislative measures which attempt to minimize or eliminate corruption, or even the appearance of corruption, in the gaming industry involve a compelling state interest. Further-

more, we do not believe that, in targeting campaign contributions as a manner of minimizing the potential for corruption in the gaming industry, the General Assembly was obliged to conduct its own independent study of the issue, and make a full-blown legislative record, rather than relying upon the experience of other states with gaming. The *Soto* court, quoting from the New Jersey trial court's opinion, cogently articulated the obvious and inherent reasons why it is appropriate to attempt to eliminate even the appearance of corrupting influences in the gaming industry:

> **"As the history of this State's public policy towards casino gambling reflects, there has been a longstanding and strong sensitivity to the evils traditionally associated with casino gambling when it is unregulated, and even when there is regulation, there is a continued sensitivity to the maintenance of the integrity of the process, and in particular, the regulatory process.**
>
> As I pointed out earlier, when casino gambling was legalized here in New Jersey, it was only on the condition that it be strictly regulated and that the regulation that came out of it extended not only to the casinos but to the people who ran the casinos.
>
> The Legislature recognized when it passed the Casino Control Act the limitation that the constitutional amendment carried with it and **the Legislature recognized the concentration of wealth that exists with casinos and the disproportionate weight of that wealth, and how the casinos as a group or individually can bring that to the political process. The Legislature recognized the need for maintaining the integrity of the regulatory process,** not in just some abstract way, but because the acceptability of casino gambling in the State depends on strict regulation.
>
> An equally important fact in that process is maintaining not just the actual integrity of the regulations but the appearance of the integrity that is needed because it is with that that the public confidence will continue and how the predicate to the legalization to gambling will exist.

> Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the Constitution itself. As expressed in the Casino Control Act, which implements the Constitution's gambling clause, **it is the pronounced policy of the State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained.**"

*Soto,* 565 A.2d at 1093–94 (quoting unpublished trial court opinion) (emphasis added by *Soto* appellate court); *see also Foster,* 820 So.2d at 506–07.

The fact that measures designed to eliminate the prospect and appearance of corruption in the gaming industry may reflect a compelling governmental interest does not mean that a particular form of regulation is required. And, as our survey of other states with gaming reveals, the approach to political contributions has not been uniform: the majority of states do not regulate that form of expression at all, while the states that do regulate the expression target different individuals and interests. In the absence of a specifically governing constitutional provision or other constitutional infirmity, it is for the legislative branch to determine, in the first instance, whether to address political contributions by those associated with gaming, and if so, the contours of the restriction. We do not doubt that, in targeting political contributions by persons connected with the nascent industry of gaming in Pennsylvania, the General Assembly sought to encourage confidence both in the legislative body which authorized the new industry and in the integrity of the industry itself.[16]

Ultimately, what matters most for purposes of the constitutional challenge forwarded here is the specifics of the Pennsylvania legislation. And what is notable about that regulatory

16. Notably, the Election Code requires disclosure of a candidate's contributions and expenditures. Specifically, all contributions to political candidates or committees must be reported where the candidate receives or expends in excess of $250, *see* 25 P.S. § 3246, and violations of the reporting requirements implicate civil and criminal penalties. *See, e.g.,* 25 P.S. §§ 3257, 3260b, 3550.

scheme is that, although the General Assembly did not produce the sort of legislative record DePaul believes it should have in order to establish a compelling governmental interest, the Legislature did include a detailed provision addressing "Legislative intent" in the Gaming Act, and that provision directly addressed the issue of the corrupting influence of campaign contributions. Thus, Section 1102 begins by stating, "The General Assembly recognizes the following public policy purposes and declares that the following objectives of the Commonwealth are to be served by this part." 4 Pa.C.S. § 1102. A list of eleven objectives then follows, the first and last of which are relevant here:

(1) The primary objective of this part to which all other objectives and purposes are secondary is **to protect the public** through the regulation and policing of all activities involving gaming and practices that continue to be unlawful.

\* \* \* \*

(11) It is necessary to maintain the integrity of the **regulatory control and legislative oversight** over the operation of slot machines in this Commonwealth; to prevent the actual or appearance of corruption that may result from **large campaign contributions;** ensure the bipartisan administration of this part; and **avoid actions that may erode public confidence in the system of representative government.**

*Id.* (emphases added). This statement of intent and purpose articulates a more narrow governmental interest than was at issue in *Foster* and *Soto* and requires that this Court engage in a correspondingly more precise measure of the means adopted to advance the identified interest. The General Assembly plainly stated that its intention in addressing the effect of campaign contributions was to prevent the corrupting influence or appearance resulting from **large** campaign contributions, not **all** campaign contributions.

The constitutional question, therefore, is whether Section 1513 is narrowly drawn to accomplish the compelling state interest of preventing the "actual or appearance of corruption"

in the regulation of the gaming industry that might result from large campaign contributions. DePaul argues that Section 1513 is not narrowly tailored to further that interest because there are practicable, less intrusive means. Specifically, DePaul notes, a limit on the amount of contributions (such as was at issue in *Buckley* ) would precisely forward the identified interest, and would preserve the citizen contributor's right to participate in political activities through the expressive and associative conduct represented by donations. DePaul maintains that Section 1513 cannot survive constitutional scrutiny because it entirely deprives an individual involved in the gaming industry of this form of political association and expression, irrespective of whether a large contribution is at issue—and even where there is no connection between a candidate and the gaming industry.

We agree. While the ban on political contributions does further the compelling state interest in avoiding the appearance of corruption in the oversight of the gaming industry, Section 1513 is not narrowly tailored. A statute that limited the size of contributions, rather than absolutely prohibiting any contributions, would be more narrowly drawn to accomplish the stated goal. Banning **all** contributions is not a narrowly drawn means of furthering a policy of negating the corrupting effect and appearance of **large** contributions. It totally bans a protected form of political expression and association which is unrelated to the identified interest, and does so despite the availability of more narrowly tailored restrictions. The obvious disconnection between the articulated interest and the means chosen renders the ban constitutionally infirm under Article I, Section 7 as, in our judgment, it clearly, palpably and plainly violates that constitutional provision.

We do not dispute the power of the Commonwealth's policy arguments: *e.g.,* its emphasis that the ban does not reach conduct more traditionally regarded as expression, such as joining political committees and groups, participating in their activities, speaking on public issues in support of candidates; and its argument, premised upon the Illinois Supreme Court's

decision in *Schiller Park*, 63 Ill.2d 499, 349 N.E.2d 61, that banning all political contributions is more effective in eliminating the appearance of corruption. These arguments, however, do not adequately come to terms with the specifics of this legislation. The General Assembly articulated a specific governing intention and purpose behind its decision to regulate campaign contributions, and the means it chose to effectuate that policy are not narrowly tailored to the interest expressed. The means chosen directly burden a constitutionally protected form of expression that is no less legitimate or important than other forms of expression. Our decisional task is not to determine if it is a better policy to ban all contributions Rather, we must accept the intention of the restriction as stated and apply the governing test; doing so, we are constrained to hold that the absolute ban on campaign contributions is unconstitutional.

DePaul's verified petition characterizes his challenge of Section 1513 as both facial and as-applied. Although the statute certainly was applied to DePaul, we view his challenge as properly implicating facial concerns as DePaul essentially argues that there exist no circumstances under which the statute, as written, would be valid. *See Wash. State Grange v. Wash. State Republican Party*, —— U.S. ——, ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (law is facially unconstitutional where it appears no set of circumstances exists under which it would be valid and that law is unconstitutional in all of its applications)). Where, as here, protected expression is at issue, both the U.S. Supreme Court and this Court have recognized that "the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Commonwealth v. Ickes*, 582 Pa. 561, 873 A.2d 698, 702 (2005) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)); *see also Wash State Grange*, 128 S.Ct. at 1191 n. 6 (same). Here, we have found a wholesale banning of

political contributions to be impermissible when read in light of the legislative purpose of addressing the impact of large contributions on public confidence and trust. In this context, it is apparent that the scope of the impermissible effects, *i.e.*, the banning of small contributions and/or contributions unlikely to affect public confidence, is quite substantial.[17]

For the foregoing reasons, we hold that 4 Pa.C.S. § 1513 is in violation of Article I, Section 7 of the Pennsylvania Constitution and we enjoin its enforcement.[18]

Justice SAYLOR, EAKIN and BAER and Justice TODD join the opinion.

Justice McCAFFERY files a dissenting opinion.

### DISSENTING OPINION

Justice McCAFFERY.

I agree with many of the majority opinion's significant conclusions. I agree that Section 1513 of the Pennsylvania

**17.** DePaul also argues that Section 1513 runs afoul of Article I, Sections 1 and 26 because it unlawfully and irrationally discriminates against persons with a broad range of associations to licensed gaming, denying them the right to participate in the political process. Due to our resolution of DePaul's challenge pursuant to Article I, Section 7, there is no need to address his distinct challenge under Article I, Sections 1 and 26.

**18.** DePaul's challenge appears to encompass the entirety of Section 1513, although the focus necessarily is on subsection (a). We note that the other subsections appear intertwined with subsection (a) and designed, for the most part, to implement subsection (a). It does not appear that they can stand alone. Thus, subsection (a.1) prohibits indirect political contributions (those made to an association or organization that supports a candidate); subsection (a.2) establishes a website listing all applicants, licensees, licensees from other jurisdictions, affiliates, subsidiaries, holding companies, principals and key employees thereof and provides that any individual who acts in good faith and relies on the information contained in the website is not subject to penalty; subsection (b) requires an annual certification under oath by the chief executive officer or other appropriate individual of any applicant or licensee that the applicant or licensee has taken appropriate steps to prevent any violations of subsection (a) and that a good faith investigation has revealed no such violations; subsection (c) describes the penalties; and subsection (d) contains definitions.

Race Horse Development and Gaming Act ("Gaming Act")[1] implicates the free speech rights protected by Article I, Section 7 of the Pennsylvania Constitution. *See* maj. op. at 591–93, 969 A.2d at 547–48. I agree that the Pennsylvania Constitution requires that we apply strict scrutiny in our review of Section 1513. *See* maj. op. at 591–93, 969 A.2d at 547–48. I agree that the Gaming Law measures, such as Section 1513, designed to "attempt to minimize or eliminate corruption, or even the appearance of corruption, in the gaming industry involve a compelling state interest." *See* maj. op. at 597, 969 A.2d at 550. I agree that the purpose of Section 1513 is "to encourage confidence both in the legislative body which authorized the new industry and the integrity of the industry itself." *See* maj. op. at 598, 969 A.2d at 551. I agree that "in targeting campaign contributions as a manner of minimizing the potential for corruption ... the General Assembly was [not] obliged to conduct its own independent study of the issue ... [but could] rely[ ] upon the experience of other states with gaming." *See* maj. op. at 597, 969 A.2d at 550. In fact, I believe that the well-written majority opinion proceeds splendidly until its final pages, when it determines that the laudable and compelling state goal of Section 1513 to prohibit principals in the gaming industry from making political contributions is overbroad because it happens to conflict with one clause of several applicable "public policy purposes" articulated in Section 1102 of the Gaming Act.[2] I believe at this point in the opinion, the majority takes an erroneous path. Moreover, because I believe that Section 1513 is narrowly tailored to its compelling state purpose, has a "plainly legitimate sweep," [3] and is thus constitutional, I must respectfully dissent.

Any exploration of the issue before us must **hew** to the following fundamental principles concerning constitutional challenges. "[A]ny party challenging the constitutionality of a statute must meet a heavy burden, for we presume legislation to be constitutional absent a demonstration that the statute

1. 4 Pa.C.S. § 1513.

2. 4 Pa.C.S. § 1102.

3. *Washington State Grange v. Washington State Republican Party*, —— U.S. ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008).

'**clearly, palpably, and plainly**' violates the Constitution."
*Konidaris v. Portnoff Law Associates, Ltd.,* 598 Pa. 55, 953
A.2d 1231, 1239 (2008) (emphasis added; citation omitted).
The presumption that legislative enactments are constitutional
is strong. *Commonwealth v. McMullen,* 961 A.2d 842, 846
(Pa.2008); *see also* 1 Pa.C.S. § 1922(3) (providing that in
ascertaining the intent of the General Assembly in the enact-
ment of a statute, there is the presumption that the General
Assembly did not intend to violate federal and state constitu-
tions by enacting such legislation). All doubts are to be
resolved in favor of finding that the legislative enactment
passes constitutional muster. *Pennsylvanians Against Gam-
bling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275,
877 A.2d 383, 393 (2005). Moreover, "**statutes are to be
construed whenever possible to uphold their constitution-
ality.**" *In re William L.,* 477 Pa. 322, 383 A.2d 1228, 1231
(1978) (emphasis added).

In my opinion, the approach taken by the majority in
determining the constitutionality of Section 1513 is at odds
with these principles. The majority declares Section 1513
invalid because it is not narrowly tailored to one of the many
"public policy purposes" articulated in the Gaming Act, namely
the goal that the Gaming Act is "to prevent the actual or
appearance of corruption that may result from large campaign
contributions." 4 Pa.C.S. § 1102(11). However, this state-
ment of principle is only **one** articulated goal in **one** of eleven
subsections of Section 1102. In fact, the majority quotes and
**emphasizes** several "public policy purposes" from Section
1102 as follows:

(1) The primary objective of this part to which all other
objectives and purposes are secondary is **to protect the
public** through the regulation and policing of all activities
involving gaming and practices that continue to be unlawful.

\* \* \* \*

(11) It is necessary to maintain the integrity of the **regula-
tory control and legislative oversight** over the operation of
slot machines in this Commonwealth; to prevent the actual

or appearance of corruption that may result from **large campaign contributions;** ensure the bipartisan administration of this part; and **avoid actions that may erode public confidence in the system of representative government.** Maj. op. at 598, 969 A.2d at 551 (emphasis in original; quoting 4 Pa.C.S. § 1102(1), (11)).

The fact that the majority emphasizes several goals from Section 1102, not simply the goal concerning "large contributions," indicates that the majority believes that these goals are applicable to and potentially supportive of Section 1513. I would certainly agree. In fact, I believe that Section 1513's prohibition on political contributions by gaming industry principals can safely be interpreted as a requisite means to "avoid actions that may erode public confidence in the system of representative government." 4 Pa.C.S. § 1102(11). Moreover, the General Assembly indicated that its primary goal, **to which all others are secondary,** including the one concerning large campaign contributions, is "to protect the public through the regulation and policing of all activities involving gaming." 4 Pa.C.S. § 1102(1). I believe Section 1513 falls under the blanket of that goal as well.[4]

The fact that the General Assembly articulated a concern regarding "the actual or appearance of corruption that may result from large **campaign** contributions," does not mean that the General Assembly was not **additionally** concerned with the corrupting connection, whether actual or apparent, between politics in this Commonwealth and **all** monetary contributions of gaming industry principals. Section 1513

---

**4.** Arguably, the "public policy purpose" set forth in Section 1102(7) also applies. That section deems the participation in authorized gaming to be a "**privilege,** conditioned upon the proper and **continued qualification** of the licensee or permitee...." 4 Pa.C.S. § 1102(7) (emphasis added). Section 1513(c) provides that certain violations of that section shall result in suspension or revocation of the gaming license. Additionally, Section 1102(8) provides that there shall be strict monitoring and enforcement control over all aspects of gaming authorized by the provisions of the Gaming Act "through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, **practices, activities,** licensees and permittees." 4 Pa.C.S. § 1102(8) (emphasis added). I believe that Section 1513 falls under the ambit of this policy purpose as well.

does not merely prohibit **campaign** contributions. That section, entitled **"Political influence,"** eliminates **all** contributions by gaming industry principals to candidates, political party committees, other political committees, or related organizations. Also eliminated are "political contribution[s] ... to any association or organization, including a nonprofit organization, that has been solicited by, or knowing that the contribution or a portion thereof will be contributed to, the elected official, executive-level public employee **or** candidate for nomination or election to a public office in this Commonwealth." 4 Pa.C.S. § 1513(a.1) (emphasis added).

That Section 1513 exists at all is, in my opinion, conclusive proof that the General Assembly was concerned with more than the corrupting influence or the appearance of a corrupting influence of large campaign contributions. We must presume that the General Assembly intends that the **entire statute** is "to be effective and certain." 1 Pa.C.S. § 1922. Further, even if there is a conflict between Section 1513 and one of the stated "public policy purposes" of Section 1102, which I believe does not exist for the above and other reasons,[5] we must observe the rule that the particular controls the general. "Whenever a general provision in a statute shall

**5.** Even if we directly compare Section 1513 with the public policy purpose that the Gaming Act is "to prevent the actual or appearance of corruption that may result from large campaign contributions," it is not a certainty that these two provisions are in conflict. The majority opinion never explored what the General Assembly meant by "large campaign contributions." Because the majority holds that Section 1513 could be more narrowly tailored to permit "less than" large campaign contributions, it seems to regard the matter of large campaign contributions as one involving a single contribution from a single source, such as Petitioner herein. That is, a large campaign contribution is one that emanates from **one** gaming industry principal. However, the actual or apparent corrupting influence of large campaign contributions can also be viewed as being accomplished by the **cumulative** effect of many small contributions coming from the many gaming industry principals throughout the state. Indeed, this interpretation is suggested by Section 1513's explicit prohibition of many seemingly small contributions. *See infra* n. 6. Ultimately, even if there is a conflict in the Gaming Act under **one** possibility, we are required, whenever possible, to construe a statute in a manner that upholds its constitutionality, *i.e.,* where another possibility supports the validity of the statute. *See In re William L., supra* at 1231.

be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision...." 1 Pa.C.S. § 1933. In other words, we are required to presume the General Assembly knew exactly what it was doing when it promulgated Section 1513, notwithstanding any articulated public policy provision that superficially seems to be in conflict with the actual legislation.

Boiled down to its essence, however, the majority opinion declares Section 1513 invalid on the grounds that the General Assembly somehow "forgot" that in promulgating Section 1513 (a detailed, clear and specific piece of legislation), it was concerned only with addressing the issue of "large campaign contributions." [6] I cannot support such an analysis, one that, I respectfully suggest, flies in the face of a plain reading of the Gaming Act, applicable rules of statutory construction, and the fundamental and controlling principles of law that make invalidating a statute on constitutional grounds a more strenuous exercise than that followed by the majority. Moreover, I fear

---

**6.** Indeed, the detailed and nuanced thought devoted to Section 1513 by the General Assembly is clear simply from a perusal of its definition of "contribution," as follows:

"Contribution." Any payment, gift, subscription, assessment, contract, payment for services, dues, loan, forbearance, advance or deposit of money or any valuable thing made to a candidate or political committee for the purpose of influencing any election in this Commonwealth or for paying debts incurred by or for a candidate or committee before or after any election. The term shall include the purchase of tickets for events including dinners, luncheons, rallies and other fundraising events; the granting of discounts or rebates not available to the general public; or the granting of discounts or rebates by television and radio stations and newspapers not extended on an equal basis to all candidates for the same office; and any payments provided for the benefit of any candidate, including payments for the services of a person serving as an agent of a candidate or committee by a person other than the candidate or committee or person whose expenditures the candidate or committee must report. The term also includes any receipt or use of anything of value received by a political committee from another political committee and also includes any return on investments by a political committee.

4 Pa.C.S. § 1513(d).

that the manner by which the majority invalidates Section 1513 will cause confusion for our lower courts when in the future they are required to review the constitutionality of legislation. Statements of public policy or legislative intent in statutes (when they exist at all) aid the courts in interpreting statutes. If an act is completely at odds with the stated purpose of the legislation, that is one thing. However, where we can easily view a piece of legislation as being in harmony with at least some of the stated purposes of the governing act, I do not see how our stringent principles of constitutional review, which impose a strong presumption of constitutionality on acts of legislation and require the courts to, if at all possible, uphold the constitutionality of a statute, permit us to use the path taken by the majority in this case. It is imperative that a request for judicial interference "with the process by which the General Assembly enacts laws" be approached with "trepidation." *Pennsylvanians Against Gambling, supra* at 404.

Accordingly, in order to resolve the case before us, I believe we must directly address the constitutionality of Section 1513 based on **its** provisions, *i.e.,* we must decide whether a total prohibition of political contributions by gaming industry principals is violative of the Pennsylvania Constitution.[7] Thus, unlike the majority, I would apply a full *Edmunds* analysis to the issue.[8] Further, as outlined below, I believe that such

---

**7.** As the majority observes, the critical constitutional provision at issue states: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa. Const. art. I, § 7.

**8.** *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). The four *Edmunds* inquiries devised to facilitate a principled consideration of state constitutional doctrine pertain to: (1) the text of the provision of our Constitution; (2) the history of the provision, including the case law of this Commonwealth; (3) relevant case law from other jurisdictions; and (4) policy considerations, "including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Id.* at 895.

The majority opinion actually starts upon an *Edmunds* analysis by (1) articulating the text of the relevant constitutional provision (Article 1, Section 7); (2) briefly reviewing the history of the provision and

analysis leads to the conclusion that Section 1513 survives constitutional scrutiny.

The majority correctly concludes that the Commonwealth has a compelling state interest in eliminating actual or the appearance of corruption connected with political contributions from gaming industry principals, based on what appears to be the majority's adoption of the able and relevant analysis of the Louisiana Supreme Court[9] and the New Jersey Superior Court, Appellate Division.[10] Maj. op. at 597–98, 969 A.2d at 550–51. Further, the majority appears to find the compelling state interest requirement of a strict scrutiny analysis to be substantially similar to the "exacting scrutiny" or "closely drawn" standard applicable to First Amendment challenges to similar bans on political contributions. See maj. op. at 586, 969 A.2d at 544; see also Buckley v. Valeo, 424 U.S. 1, 15–29, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam ) (upholding under the First Amendment political contribution limits imposed by the Federal Election Campaign Act of 1971 under an "exacting scrutiny" standard); Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (determining that political contribution limits that involve significant interference with free association rights under the First Amendment can survive if the govern-

relevant case law; and (3) making a **limited** review of relevant case law from other jurisdictions. But the majority has limited its review of relevant case law from other jurisdictions to cases involving bans on political contributions from persons involved in the gaming industry. However, all case law involving bans or limits on political contributions from whatever source (e.g., from lobbyists) is relevant to our inquiry. Constitutional free speech and association guarantees do not carve out unique considerations for persons involved in the gaming industry. Further, the majority does not engage in the final Edmunds area of inquiry: "policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence."

9. Casino Ass'n of La. v. State ex rel. Foster, 820 So.2d 494 (La.2002), cert. denied 537 U.S. 1226, 123 S.Ct. 1252, 154 L.Ed.2d 1087 (2003).

10. In re Petition of Soto, 236 N.J.Super. 303, 565 A.2d 1088 (App.Div. 1989), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990), cert. denied 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990).

ment can demonstrate that the contribution limit is "closely drawn" to match a sufficiently important government interest).[11]

Of particular significance to our review is the fact that a ban or limitation on political monetary contributions has only an **indirect** and typically a **marginal impact** on free speech and association rights.

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate.... While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Buckley, supra* at 20–21, 96 S.Ct. 612 (footnote omitted); *see also Nixon, supra* at 386–87, 120 S.Ct. 897 (quoting *Buckley, supra* at 20–21, 96 S.Ct. 612); and *California Medical Ass'n v. Federal Election Comm'n*, 453 U.S. 182, 196 n. 16, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (stating that political contributions are merely an "attenuated form of speech").

11. However, as Petitioner notes, there is some disagreement as to whether the standard articulated in *Buckley*, or as applied in subsequent case law, equates to "strict scrutiny." *See, e.g., Randall v. Sorrell*, 548 U.S. 230, 266–67, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (Thomas, J. concurring) ("I would overrule *Buckley* and subject both the contribution and expenditure restrictions ... to strict scrutiny ...."); *see also* maj. op. at 584 n. 9, 969 A.2d at 542 n. 9. Notwithstanding, we must, as noted by the majority herein, apply a strict scrutiny standard in this case. *See Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 605–12 (2002).

Section 1513's prohibition on political contributions does not prevent any gaming industry principal from exercising **other** more direct rights of free political speech or association. For example, Section 1513 does not prohibit the public endorsement of a candidate, cause, or issue; giving of one's time to a political cause; erection of lawn signs or handing out political materials; participation at the polls; providing advice to a candidate or to any voters willing to listen; or the engagement in other like forms of expression and association. Thus, Section 1513, at most, infringes upon an "attenuated form of speech." *California Medical Ass'n, supra* at 196 n. 16, 101 S.Ct. 2712.

On the other side of the equation, it must be recognized that political contribution limits and bans, although imposing some restrictions on the free exercise of political expression and association, provide significant value to the electoral process by protecting the integrity of the system, which in turn, encourages greater political participation. As the United States Supreme Court explained:

Because the electoral process is the very means through which a free society democratically translates political speech into concrete governmental action, contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate. For that reason, when reviewing [a legislature's] decision to enact contribution limits ... [courts should afford] deference to [the legislature's] ability to weigh competing constitutional interests **in an area in which it enjoys particular expertise.**

*McConnell v. Federal Election Comm'n,* 540 U.S. 93, 137, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (emphasis added; quotation marks omitted) (quoting *Nixon, supra* at 400–01, 120 S.Ct. 897 (Breyer, J., concurring)).

As the majority notes, Section 1513 was devised "to encourage confidence both in the legislative body which authorized the new industry [and by extension, the integrity of the political process] and the integrity of the industry itself." Maj. op. at 598, 969 A.2d at 551. Certainly, our General

Assembly had the "particular expertise" to evaluate the necessity of a complete ban as opposed to a lesser limitation on political contributions by gaming industry principals. The question is whether the General Assembly's determination is sufficiently "narrowly tailored" (maj. op. at 598, 969 A.2d at 551) to accomplish its compelling and obvious state interest in preserving the integrity of the political process and of the gaming industry itself without causing unnecessary infringement on free speech and association rights under the Pennsylvania Constitution. This inquiry has three components: (1) whether the class of persons banned from making political contributions is narrowly drawn; (2) whether the class of persons who will be deprived of contributions by the ban (*i.e.*, candidates, political committees, or other related organizations) is narrowly drawn; and (3) whether a ban on contributions as opposed to a limitation upon them is necessary to achieve the Commonwealth's legitimate, compelling state interest.

With respect to the first component, the majority appears to be satisfied that the class of individuals banned from making political contributions by Section 1513 is sufficiently narrow to withstand constitutional strict scrutiny. *See* maj. op. at 549–50, emphasizing portions of *In re Petition of Soto*, 236 N.J.Super. 303, 565 A.2d 1088, 1100 (App.Div.1989), *certif. denied*, 121 N.J. 608, 583 A.2d 310 (1990), *cert. denied* 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990). *Soto* upheld New Jersey's ban on political contributions by "key" casino employees. I certainly agree with the majority, and with the supporting analysis of *Soto*, that the class of individuals prohibited from making political contributions by Section 1513 has been narrowly drawn by the General Assembly to meet its compelling state interest. Thus, I believe that the aspect of Section 1513 concerning the class of gaming industry principals survives strict scrutiny.

With respect to the second component, the majority appears to agree with Petitioner's argument that Section 1513 cannot survive strict scrutiny because that section's blanket prohibition of political contributions includes persons running for political office that have "no connection ... [with] the gaming

industry." Maj. op. at 600, 969 A.2d at 552. I must disagree. Petitioner's argument ignores the reality of party politics and the fungible nature of money. One need not contribute only to party leaders to achieve certain political goals or give rise to the appearance of corruption or favoritism. The same result may be achieved or arise if an individual spreads political contributions among a party's slate of candidates for minor political posts. By contributing to "minor" political candidates, an individual still curries favor with the party and allows the party to more freely direct its thus enlarged larger pot of money toward the attainment of more significant elected offices. In other words, the contributed money could still benefit those with influence over the regulation of the gaming industry in this Commonwealth, even though initially directed to a candidate for, say, register of wills or local sheriff.

Further, I find fully persuasive the analysis of the New Jersey Superior Court, Appellate Division with respect to the importance of prohibiting gaming industry political contributions to **all** political parties or their candidates.

Political parties are institutions of very great importance under our form of government. They are, in fact, the effective instrumentalities by which the will of the people may be made vocal, and the enactment of laws in accordance therewith made possible. So potent have they become in administering the affairs of government that they are now regarded as inseparable from, if not essential to, a republican form of government, ... and as a necessary adjunct to representative government. They are imbued with a quasi-governmental character.

Political parties have come to be regarded by the courts as governmental agencies through which the sovereign power is exercised by the people. The conception that a political party is merely a private association of citizens has been generally abandoned. In most jurisdictions the state has seen fit to declare that political parties shall be, as to their mode of holding conventions and nominating candidates for public office, regarded as public bodies whose methods are to be controlled by the state.

The compelling state interest in maintaining the integrity of political parties and organizations from undue influence by those individuals who, by the very nature of their employment, play a pivotal role in the casino industry justifies upholding the restrictions found in [the New Jersey legislation].

*Soto, supra* at 1097–98 (citations omitted). Further, the New Jersey court relevantly determined:

Nor do we find the statute overbroad because it prohibits contributions to any political candidate and committee within the State regardless of whether the particular office or committee has anything to do with casino regulation. This argument was answered in *Schiller Park [Colonial Inn, Inc. v. Berz,* 63 Ill.2d 499, 349 N.E.2d 61, 67 (Ill.1976)], where the Illinois [Supreme] Court stated that '[i]t is difficult and probably impossible to determine precisely which officeholders will be in a position to exercise influence in the area of liquor regulation.' ... As noted above, the *Schiller Park* court observed that '[t]he nature of our political system and past history suggests that political officials or public officers may wield powers or possess influence beyond the powers and influence inherent in their official duties.' [*Id.*]

*Soto, supra* at 1100.

Thus, because of the importance and influence of political parties, indeed their "quasi-governmental character," I believe that a prohibition on contributions to even "minor" and purportedly "unconnected-to-gaming-issues" candidates narrowly meets the General Assembly's compelling state goal of preventing the appearance of, or actual, corruption that is associated with political contributions from gaming industry principals. Accordingly, unlike the majority, I find Petitioner's argument to be without merit.

With respect to the last component, I believe that a ban as opposed to a limitation on political contributions withstands constitutional strict scrutiny as well. First, I note that there is no *per se* rule among our sister courts that bans on political contributions, rather than limits, are unconstitutional. *See*

*Green Party of Connecticut v. Garfield,* 590 F.Supp.2d 288, 310 (D.Conn.2008) ("Courts that have had the opportunity to examine bans on contributions from selected groups, including lobbyists ... have rejected the argument that bans are *per se* unconstitutional simply because they are 'bans' and not merely 'limits' on contributions." (citing numerous examples)). Further, I note that, in an opinion that would, unlike this Court, apply less than strict scrutiny, the United States Supreme Court rejected the argument that courts should apply a stricter form of scrutiny when reviewing legislative bans on political contributions than when reviewing legislative limitations on political contributions, noting that "the level of scrutiny is based [not on whether there is a ban or simply a limitation on contributions, but] on the importance of the political activity at issue to effective speech or political association." *Federal Election Comm'n v. Beaumont,* 539 U.S. 146, 161, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (quotation marks omitted).

Second, as the majority opinion notes, New Jersey and Louisiana courts have upheld the constitutionality of **bans** on political contributions by gaming industry principals. *Soto, supra; Casino Ass'n of La. v. State ex rel. Foster,* 820 So.2d 494 (La.2002), *cert. denied* 537 U.S. 1226, 123 S.Ct. 1252, 154 L.Ed.2d 1087 (2003). Other courts have also upheld bans on political contributions by those in other industries. *See, e.g., Schiller Park, supra* (ban on contributions by holders of liquor licenses or principals of a liquor licensee); *Green Party of Connecticut, supra* (ban on contributions by lobbyists, state contractors, and their immediate family members); *Mariani v. United States,* 212 F.3d 761 (3d Cir.2000) (*en banc* ) (ban on corporate hard money contributions). This is by no means an exhaustive list, and other courts have come to different conclusions.[12] However, at the root of those decisions upholding

12. *E.g., Fair Political Practices Commission v. Superior Court of Los Angeles County,* 25 Cal.3d 33, 157 Cal.Rptr. 855, 599 P.2d 46, 53 (1979) (holding that governmental interests warranting substantial restrictions on political rights have no greater application to lobbyists than to other private campaign contributors; thus, a ban on political contributions by lobbyists is invalid because it is not "closely drawn to avoid unnecessary abridgment of associational freedoms.") (quoting *Buckley, supra* at 25, 96 S.Ct. 612).

bans on contributions and rejecting the argument that limitations would be more narrowly tailored to accomplish the state's interests, is the determination that the critical need to dispel even the appearance of corruption restrains courts from "second-guess[ing] a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Soto, supra* at 1098 (quoting *FEC v. National Right to Work Committee,* 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982)). As the New Jersey Superior Court, Appellate Division determined, apropos to the particular issue before this Court:

> Given the acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it, ... there is no viable alternative available [to a ban rather than a limitation on political contributions] to prevent the appearance of, or actual, corruption of the political process in New Jersey.... [P]ublic perception that any improper influence has infiltrated the regulatory and judicial processes, **however slightly,** would undermine the trust that is essential to continued confidence in the industry and, what is more important, in state government.

*Id.* (citations and quotation marks omitted; emphasis added).

Further, we should not overlook the fact that a mere limitation on political contributions, rather than a ban, may undercut the compelling state purpose of the legislation because many accumulated **small** contributions may be able to achieve the evil that the legislature was trying to prevent. As the Illinois Supreme Court sagely observed, with respect to challenged legislation banning political contributions by liquor licensees and their principals:

> We agree that it is large campaign contributions which are most likely to create a danger that liquor licensees or other individuals in the liquor business may obtain a degree of influence over public officials. The General Assembly may reasonably have believed, however, that its efforts to further the relevant State interests would have been much less

effective if only contributions above a certain amount were prohibited. **It is possible that a liquor licensee could circumvent a law proscribing only large contributions by financing a large number of small contributions ostensibly given by his friends and associates. Also, if many liquor licensees acted in concert and each made a small contribution to a particular candidate, it is conceivable that they could, as a group, accomplish what section 12a of the Liquor Control Act was intended to prevent.** We therefore hold that section 12a is not rendered unconstitutional by the fact that it prohibits small political contributions as well as large contributions.

*Schiller Park, supra* at 66 (emphasis added).

I find quite persuasive the analyses of these foreign jurisdictions and believe that they should play a significant role in our review, even though some of these decisions applied a lesser standard than strict scrutiny. The fundamental wisdom underlying these decisions is, in my opinion, impeccable and completely in accord with the strong presumption of constitutionality that we are to afford the acts of our General Assembly. Thus, because I believe that "members of the General Assembly are the best-positioned to determine the role that campaign contributions play on their personal decision-making process" (*Green Party of Connecticut,* 590 F.Supp.2d at 326), and because even small contributions may give rise to the evil that the General Assembly intended to prevent by the enactment of Section 1513, I would conclude that Section 1513's ban on political contributions is narrowly drawn and tailored to the clear and compelling government interests in this case.

Further, the fact that the decisions of foreign jurisdictions upholding bans on contributions rely so strongly on the very real threat or appearance of corruption, makes an analysis under the fourth *Edmunds* prong all the more critical. That prong requires an inquiry into "policy considerations, including unique issues of state and local concern, and [their] applicability within modern Pennsylvania jurisprudence." *Edmunds,* 586 A.2d at 895 (quotation marks omitted). Certainly, many of the policy considerations articulated in *Soto* and other

foreign jurisdiction cases have equal applicability to this case, as the above analysis makes clear. However, *Edmunds* also requires that we examine policy matters peculiar to our state and local concerns.

The controversy surrounding the Commonwealth's venture into gaming is no secret. The General Assembly did not enact the Gaming Act because it believed the citizens of this Commonwealth were starved for entertainment.[13] Gaming was enacted to create jobs, assist the horse racing industry, promote commerce and tourism, provide tax relief, and raise revenue, particularly in an era where it has proven difficult to raise revenue by other means. *See* 4 Pa.C.S. § 1102(2)-(6). In authorizing gaming, the General Assembly knowingly legitimized an activity "rife with evil," in the words of the New Jersey Supreme Court,[14] and fraught with the possibility that the Commonwealth would unwittingly become partnered with criminals.[15] Further, whatever financial benefit there is to be derived from gaming, the potential collateral social ills of this activity are certainly well known and of obvious concern to the citizens of this Commonwealth. Thus, it is of little surprise that the General Assembly articulated multiple "public policy purposes" emphasizing the need for close and exacting regulation of the gaming industry in order to achieve the General Assembly's primary goal of protecting the public. 4 Pa.C.S. § 1102(1), (5), (7)-(11).

"The importance of the governmental interest in preventing [corruption of elected representatives through the creation of political debts] has never been doubted." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n. 26, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Further, preventing the **perception** of corruption is an equally compelling state interest. *Buckley, supra* at 27, 96 S.Ct. 612; *Nixon, supra* at 389–90, 120 S.Ct. 897; *McConnell, supra* at 143, 150, 124 S.Ct. 619. Indeed, Section 1102(11), quoted earlier in this dissenting

13. However, the General Assembly did note an entertainment value to gaming. 4 Pa.C.S. § 1102(2).

14. *Knight v. City of Margate,* 86 N.J. 374, 431 A.2d 833, 842 (1981).

15. *See Soto, supra* at 1098.

opinion and in the majority opinion, as a whole reflects these compelling state interests. In an era when recent actions by the General Assembly have engendered considerable controversy, where "pay to play" is a commonly known expression, and where public officials of high office have found themselves subject to federal corruption prosecutions, the necessity for the General Assembly to make every effort and to take every step to avoid even the appearance of corruption in the highly-charged theater of publicly-sanctioned "gaming" is apparent. I believe that the public requires no less than the protections provided by Section 1513.

Here, where Section 1513's limitation on free speech and association rights involves only an "attenuated" form of speech and association, permitting the free expression of other, more direct, and wide-ranging forms of speech and association; where the classes of persons affected by the infringement are narrowly drawn and reasonably defined; where the Commonwealth's interests are indeed compelling; and where the General Assembly is in the best position to determine whether a ban rather than a limitation on contributions satisfies its compelling interests, I believe that Section 1513 survives a constitutional review based on the strictest scrutiny.[16] In my opinion, there is no support for the conclusion that Section 1513 " 'clearly, palpably, and plainly' violates the Constitution." *Konidaris*, 953 A.2d at 1239. Accordingly, I dissent.

---

**16.** Neither is Petitioner entitled to relief under his Article 1, Sections 20 and 26 claims. I believe that Petitioner's discrimination argument (Section 26) is weak. Moreover, as the majority notes, Petitioner's Section 20 argument is undeveloped and "subsumed within his argument related to Article I, Section 7." Maj. op. at 581 n. 8, 969 A.2d at 541 n. 8.