**[J-6-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 85 MAP 2023 |
| | : |
| Appellee | : Appeal from the Order of the |
| | : Superior Court at No. 2632 EDA |
| | : 2021 dated February 7, 2023 |
| v. | : Affirming the Judgment of Sentence |
| | : of the Delaware County Court of |
| | : Common Pleas, Criminal Division, |
| MICHAEL THOMPSON, | : at No. CP-23-CR-0002233-2020 |
| | : dated December 13, 2021. |
| Appellant | : |
| | : ARGUED:  March 5, 2024 |

## DISSENTING STATEMENT

**JUSTICE WECHT**                                          **FILED:  May 31, 2024**

Unaccountably, today's Majority refuses to decide the issue that we agreed to review: whether inventory searches remain valid under Pennsylvania's Constitution following our rejection of the federal automobile exception to the warrant requirement.[1]

---

[1]     We granted *allocatur* to answer the following question:

Whether the [t]rial [c]ourt and the Superior Court of Pennsylvania erred in determining that an inventory search of an automobile by law enforcement is an exception to the Pennsylvania Supreme Court decision in *Commonwealth v. Alexander*, 664 Pa. 145, 243 A.3d 177 (2020) requiring a search warrant before conducting a search of a person's vehicle or requir[ing] production and proof of exigent circumstances for a warrantless search of a vehicle?

*Commonwealth v. Thompson*, 303 A.3d 111 (Pa. 2023) (*per curiam*) (bracketed material in original).  If there is any obstacle to our consideration of this question, it was just as apparent when we issued this order.  I cannot discern any impediment of the sort that ordinarily warrants dismissal of an appeal as improvidently granted.  There is no procedural defect here.  The issue presented was not waived.  The matter is not moot.  There has been no change in the procedural posture of this case, nor any external change in the facts or circumstances.  There has been no intervening change in the law.  The (continued…)

We have enjoyed ample briefing and argument, and we should render decision. Inventory searches violate our Constitution because they deprive citizens of security in their possessions[2] without adequate justification. Case law has enshrined a set of flawed excuses that allow police officers to rummage systematically through citizens' property without a search warrant, on no articulable suspicion of wrongdoing whatsoever.

Inventory searches are premised upon a fiction. This sort of search is tolerated, courts say, because (despite all appearances) it is not a matter of law enforcement at all. Rather, the governmental intrusion is branded as a "community caretaking" function—a service helpfully performed by police to safeguard citizens' property. This is so notwithstanding that the property's owner, whose thoughts on the matter are not invited, would prefer not to be the beneficiary of this "service." Indeed, in every case in which an appellate court perpetuates the inventory search fiction, the owner of the property has been convicted of a crime based upon what a police officer discovered while rummaging through the owner's belongings. Quite the service, indeed.

We can call it whatever we want. The fact of the matter is that a government agent is conducting a search—without a search warrant, without any exigency or compelling need, and without even probable cause that evidence of a crime will be found inside the vehicle. For too long the law has legitimized these fishing expeditions. And because the justifications offered in their support cannot withstand even minimal scrutiny, continuing to pretend that the inventory search is a valid law enforcement function leaves the law

---

issue presented is precisely the same now as it was when this Court granted allowance of appeal. There appears to be no reason to dismiss this appeal beyond an apparent change in the Majority's willingness to consider the significant legal question that it raises.

2     *Compare* PA. CONST. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures . . . ."); *with* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

with a "yawning credibility gap" that we should no longer tolerate.[3]  There is no good reason for this species of search.  The inventory search is an unreasonable search, for it needlessly strips people of their right to privacy in their possessions guaranteed under Article I, Section 8 of the Pennsylvania Constitution, while providing no corresponding benefit to any legitimate governmental interest.

Privacy is the watchword.  Although the reasons for the Court's dismissal today are unstated, the difficulty may be the perceived degree of connection between the inventory search doctrine and our decision in *Commonwealth v. Alexander*.[4]  While *Alexander* does not directly answer the question before us, the connection is apparent on the face of the case law.  The inventory search doctrine is built upon the very same foundation as the federal automobile exception that we rejected in *Alexander*: the United States Supreme Court's insistence that people have a diminished privacy interest in their vehicles, which interest is therefore unworthy of any meaningful protection.  Here in Pennsylvania, as *Alexander* makes plain, our Constitution (which predates the United States Constitution by a dozen years) embodies "a strong notion of privacy, notwithstanding federal cases to the contrary."[5]  This recognition of significant privacy rights forms the core of this Court's conclusion that Article I, Section 8 of the Pennsylvania Constitution "affords greater protection to our citizens than the Fourth Amendment" in the context of vehicle searches.[6]  It is not *Alexander*'s rejection of the federal automobile

---

[3]  Charles E. Moylan, Jr., *The Inventory Search of an Automobile: A Willing Suspension of Disbelief*, 5 U. Bal. L. Rev. 203, 203 (1976).

[4]  *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020) (holding that the federal "automobile exception" to the warrant requirement is invalid under Article I, Section 8 of the Pennsylvania Constitution).

[5]  *Alexander*, 243 A.3d at 203 (quoting *Commonwealth v. Edmunds*, 586 A.2d 887, 898 (Pa. 1991)).

[6]  *Id.* at 181.

exception that controls the matter before us.  Rather, *Alexander*'s relevance lies in its doctrinal underpinnings, which are plainly inconsistent with the assumptions underlying the federal approach to privacy rights in vehicles and, thus, with inventory searches.

## I.

Let us recall what an inventory search is.  When a driver is arrested and cannot lawfully move the vehicle for whatever reason, and the vehicle is in a place where it cannot remain—where it is unlawfully parked or poses some obstacle to traffic or the like—the vehicle may need to be impounded.  Most often, this is achieved when a police officer summons a tow truck operated by a private towing company.  But, because police officers ostensibly are in possession of the arrestee's property (even though it often is turned over to the towing company), they deem themselves responsible for its safekeeping.  Thus, a police officer enters the car, searches it, and creates an "inventory" of the items inside it.

Why?  According to the United States Supreme Court's decision in *South Dakota v. Opperman*, this intrusion is justified by "three distinct needs," none of which (we are told) relates to investigation of the driver for any potential crime.[7]  I discuss each of these "needs" in detail below.  It is the purportedly non-investigatory purpose of these "needs," courts say, that ameliorates the obvious constitutional concern raised when a police officer searches a person's property without a warrant, and without even probable cause of wrongdoing.  None of the safeguards that attend the warrant procedure are relevant, the inventory search doctrine holds, because, before conducting the search, the police officer removes his or her proverbial "criminal investigator" hat and dons a "community caretaker" hat, whereupon the officer's role suddenly is "totally divorced" from any interest

---

[7]     *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

in investigating crime.[8]  When the officer then rummages through the car, ostensibly for non-investigatory reasons, and comes across evidence of a crime (by sheer happenstance, of course), the officer again dons the "criminal investigator" hat, and the evidence may then be seized and used against the motorist in a criminal prosecution. Through this convenient device and imperceptible shift in the officer's ostensible motivation, evidence for a prosecution is gathered without any of the safeguards mandated by our Constitution.

## II.

What does that have to do with *Alexander*?  After all, *Alexander* concerned the federal automobile exception—a rule in Fourth Amendment jurisprudence that allows immediate, warrantless searches of vehicles upon the establishment of probable cause.[9] To be sure, the federal automobile exception is a wholly distinct constitutional doctrine, which does not implicate "community caretaking," and *Alexander* did not address inventory searches.  However, a brief review of *Opperman* reveals that inventory searches rely upon the same rationalization as the federal automobile exception—the same one that we rejected unequivocally in *Alexander*.

*Opperman* begins with the premise that, under the Fourth Amendment, automobiles are entitled to significantly less protection than other protected spaces.  In

---

[8]     *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) ("Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."); *see Opperman*, 428 U.S. at 368 (quoting *Cady*) ("In the interests of public safety and as part of what the Court has called 'community caretaking functions,' . . . automobiles are frequently taken into police custody.").

[9]     *See, e.g.*, *California v. Carney*, 471 U.S. 386, 390-94 (1985); *Chambers v. Maroney*, 399 U.S. 42, 48-52 (1970); *Carroll v. United States*, 267 U.S. 132, 153-59 (1925).

the very first sentence of its analysis, the *Opperman* Court stated that the "Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment."[10] The Court then proceeded through the rationales that undergird the federal automobile exception. First, the Court noted the supposed exigency that arises from the inherent mobility of vehicles. "Besides the element of mobility," however, "less rigorous warrant requirements govern because *the expectation of privacy with respect to one's automobile is significantly less* than that relating to one's home or office."[11] The *Opperman* Court observed that police frequently interact with automobiles, and that automobiles are subject to pervasive government regulation.[12] The Court added that the "obviously public nature" of automobile travel further "diminishes" the expectation of privacy in vehicles:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.[13]

Clearly underlying the *Opperman* Court's rationale approving of inventory searches was its baseline assumption that the Fourth Amendment provides only minimal protection of automobiles, and that, due to the diminished expectation of privacy therein, intrusions into automobiles are not significant enough to require search warrants.[14]

---

[10]      *Opperman*, 428 U.S. at 367.

[11]      *Id.*

[12]      *Id.* at 368.

[13]      *Id.* (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974)).

[14]      Subsequent cases have underscored the fact that the Court's diminished-privacy rationale was foundational to its inventory search doctrine. As the Court later summarized its decision:

(continued…)

Any reader of our decisions in this area will know that the "diminished expectation of privacy" rationale is familiar to this Court. Relying in part upon *Opperman*, a plurality of this Court in *Commonwealth v. Gary* sought to adopt the diminished-privacy rationale as the law of Pennsylvania, but did not receive majority support for its approach.[15] Rather, the Court in *Gary* adopted the federal automobile exception only by virtue of then-Justice Saylor's concurrence, in which he voiced "reservations," but nonetheless supported the adoption of the federal rule, not for the reasons offered by the plurality, but instead "for the sake of certainty and consistency."[16]

Significantly for subsequent Pennsylvania law, then-Justice, now-Chief Justice Todd authored a powerful dissent in *Gary*, in which she illustrated the incompatibility between the federal automobile exception and our greater respect for privacy rights under Article I, Section 8 of the Pennsylvania Constitution.[17] In so doing, Justice Todd laid waste to the United States Supreme Court's diminished-privacy rationale, stressing that the *Opperman*-era theory has been "seriously eroded by both the advance of technology and the practical reality of how owners, operators, and passengers in automobiles utilize

---

> In *Opperman*, this Court assessed the reasonableness of an inventory search . . . . We found that inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. *In light of these strong governmental interests and the diminished expectation of privacy in an automobile*, we upheld the search.

*Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987) (emphasis added).

[15] *Commonwealth v. Gary*, 91 A.3d 102, 127-28 (Pa. 2014) (plurality) (citing, *inter alia*, *Opperman*, 428 U.S. at 367-68).

[16] *Id*. at 138 (Saylor, J., concurring).

[17] *Id*. at 139-60 (Todd, J., dissenting) (analyzing the protections afforded by the Pennsylvania Constitution under the rubric of *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991)). Then-Justice Baer joined then-Justice Todd's *Gary* dissent.

them in modern times."[18]  Like the *Gary* plurality, Justice Todd expressly recognized *Opperman* as critical to the development of the federal approach to the privacy interests (or lack thereof) in automobiles.[19]  Indeed, stressing that the Supreme Court's justifications for the federal automobile exception have shifted over time toward the diminished-privacy rationale, Justice Todd noted that the Supreme Court "has never fully explained its rationale in electing to place primary emphasis on the factors it cited in *Carney*—which it imported from *Opperman*—in order to justify its complete dispensation with the warrant requirement."[20]  Justice Todd then proceeded through the Supreme Court's purported justifications for the diminished-privacy rationale, stressing that it is inconsistent with the manner in which people actually use their vehicles, and that the pervasive governmental regulation of automobiles is an insufficient reason to allow warrantless searches of their interiors.[21]

Under the compelling logic of Justice Todd's *Gary* dissent, the foundation of *Opperman* is outdated at best, and at worst nonsensical.  It would be one thing if Justice Todd's dissent remained a minority view, but, as our subsequent decision in *Alexander* makes clear, Justice Todd's perspective in *Gary* correctly articulated the law of this Commonwealth.  In overruling *Gary* and rejecting the federal automobile exception under

---

[18]     *Id.* at 139 (Todd, J., dissenting).

[19]     *Id.* at 148-49 (noting that, in the 1970s, the Supreme Court "began to treat the entirety of an automobile as an area in which its owner or occupant possesses a diminished expectation of privacy") (citing *Opperman*, 428 U.S. at 367-69; *Cady*, 413 U.S. at 441-42).

[20]     *Id.* at 149.

[21]     *Id.* at 149-54.

our own Constitution, this Court in *Alexander* expressly adopted Justice Todd's constitutional analysis in *Gary*. [22]

A perusal of *Alexander* reveals that this Court plainly rejects *Opperman*'s diminished-privacy rationale. Where *Opperman* reasoned that people have a diminished expectation of privacy in automobiles due, in part, to its insistence that the function of automobiles is solely "transportation," and that automobiles do not often serve as a "repository of personal effects," *Alexander* invoked Justice Todd's more realistic view:

> Moving to the privacy interests involved, Justice Todd strenuously disagreed with the [*Gary*] plurality's diminishment of privacy expectations regarding vehicles. Quoting scholarly criticism of the high Court's arguments on that point, Justice Todd concluded that the plurality's analysis "disregards the plain fact that today's automobile is not just used to transport persons, but, also, to store and transport a myriad of their most private belongings." Nor is a car just a car; most Americans view their vehicle "as something more than just a means of transportation."[23]

In short, *Opperman*'s assertions are inconsistent with reality—people *do* view their cars as valuable for more than mere transportation, and cars often *do* contain people's personal effects. *Alexander* recognized this truth, and it rejected *Opperman*'s diminished-privacy rationale as a matter of Pennsylvania constitutional law.

---

[22] *See Alexander*, 243 A.3d at 202 ("We conclude that Justice Todd's *Edmunds* analysis thoroughly and convincingly established the heightened protocols of Article I, Section 8 and see no need to tread that same ground. The scholarly analysis thoroughly discussed the four *Edmunds* factors, and we adopt Justice Todd's compelling analysis as our own.").

[23] *Id.* at 190 (quoting *Gary,* 91 A.3d at 152-53 (Todd, J., dissenting)) (citations omitted); *see also id.* at 192 ("Vehicles contain a variety of features that let users store items away from public view such as trunks, glove boxes, and internal storage compartments. A vehicle is not just a method of transportation, as drivers frequently take long drives and many Americans opt for driving to work instead of taking public transportation precisely because of the privacy afforded by vehicles. As Justice Todd summarized the point, a vehicle functions as a 'home away from home.'").

*Alexander* is relevant to the viability of inventory searches under the Pennsylvania Constitution because *Alexander* made clear that our law protects people's privacy interests in their vehicles. Inventory searches, by contrast, are premised upon a baseline assumption in federal law that this interest is unworthy of meaningful protection under the Fourth Amendment—that intrusions into vehicles are not really a "big deal," at least not to the extent that a search warrant should be required. In Pennsylvania, such deprivations of privacy are a big deal. The incompatibility between *Alexander* and *Opperman* is apparent on the face of the opinions. One cannot read those decisions in tandem and come away with the sense that *Opperman* is consistent with Article I, Section 8 of our Constitution.[24]

Having expressly rejected the assumption underlying *Opperman*, why would we embrace its conclusion? The question is not one of "departure" from federal law— *Alexander* and Justice Todd's *Gary* dissent already have performed the relevant *Edmunds* analysis on that question.[25] Because we *already have* departed from the applicable federal law, the question should be whether anything in *Opperman* warrants

---

[24] To the extent that one could question whether the instant appeal properly frames the issue, Appellant Michael Thompson's brief plainly connects his challenge to the inventory search doctrine to *Alexander*'s recognition of enhanced privacy protections in vehicles. *See* Thompson's Br. at 13 (asserting that "the Fourth Amendment standard used in both *Cady* and *Opperman* to justify the search of a vehicle simply does not apply to this case"); 14 (*Alexander* "definitively rejected the . . . rationale stated in *Opperman*"; *Opperman*'s diminished-privacy rationale "is exactly the opposite of what this Court dictated in *Alexander*"); 14-16 (discussing the greater privacy interests recognized in *Alexander* and Justice Todd's *Gary* dissent). As well, the Superior Court in this case, although deeming itself bound by existing precedent, also correctly framed the issue for us. *Commonwealth v. Thompson*, 289 A.3d 1104, 1111 (Pa. Super. 2023) ("The *Alexander* Court's rejection of the United States Supreme Court's views on the privacy interests involved in an automobile may well support some limitations on the inventory search doctrine.").

[25] *See DePaul v. Commonwealth*, 969 A.2d 536, 547 (Pa. 2009) (noting that, "[g]iven this Court's extensive consideration of Article I, Section 7 under the *Edmunds* factors" in an earlier decision, "there is no reason to engage in a full-blown *Edmunds* analysis here").

our continued adherence to the rule that it endorses. And when one considers the reasons that *Opperman* gave for approving inventory searches, it quickly becomes apparent that they are remarkably devoid of merit.

**III.**

As noted above, *Opperman* insisted that inventory searches have nothing at all to do with investigating crime, but rather constitute a "community caretaking" function. This is because, the Court claimed, inventory searches are not about obtaining evidence, but, rather, "developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger."[26] Although each supposed "need" implicates some legitimate goal in the abstract—or sounds that way, anyway—the inventory search does nothing to advance the stated interests. Indeed, inventory searches are *harmful* to those interests.

Let us assess each supposed "need" in turn.

**(a) "Protection of the owner's property while it remains in police custody"**

Immediately, we face a contradiction. The premise that protecting the vehicle owner's personal property provides a reason to rummage through the vehicle without a warrant is facially incompatible with the *Opperman* Court's asserted reasons for finding a diminished expectation of privacy in the vehicle in the first place. *Opperman* noted that "standard inventories often include an examination of the glove compartment, since it is a customary place for documents of ownership and registration, *as well as a place for the temporary storage of valuables*."[27] Perhaps the *Opperman* Court hoped that the reader would forget its assertion, mere paragraphs earlier, that the privacy interest in vehicles is

---

26      *Opperman*, 428 U.S. at 369 (citations omitted).

27      *Id.* at 372 (emphasis added; citation omitted).

diminished because vehicles "seldom" serve as a "repository of personal effects."[28]  It is curious that an inventory search is necessary to protect valuables that the Court insists are unlikely to be in the vehicle at all.

In any event, the claim that the police officer is conducting the search for the owner's benefit is dubious.  Although the Supreme Court has made some efforts to constrain the decision-making discretion of officers performing inventory searches"[29] there is one party whose choice in the matter is conspicuously absent from the discussion—the owner of the vehicle.  As Justice Marshall suggested in dissent in *Opperman*:  "It is at least clear that any owner might prohibit the police from executing a protective search of his impounded car, since by hypothesis the inventory is conducted for the owner's benefit.  Moreover, it is obvious that not everyone whose car is impounded would want it to be searched."[30]  Yet, the Supreme Court has ignored this "obvious" objection.

Indeed, in *Bertine*, the Court expressly rejected a lower court's suggestion that an inventory search was unreasonable because the owner had not been "offered the

---

[28]     *Id.* at 368 (quoting *Cardwell*, 417 U.S. at 590); *but see Alexander*, 243 A.3d at 190; *Gary*, 91 A.3d at 152-53 (Todd, J., dissenting).

[29]     The Court has attempted to provide a guardrail in its references to the need for "standard police procedures" to avoid the potential for abuse.  *Id.* at 372, 376; *see also Bertine*, 479 U.S. at 372-76; *Florida v. Wells*, 495 U.S. 1, 3-5 (1990).  The Supreme Court's suggestion that "standard procedures" serve as a sort of constitutional salve is not my focus here, because I find the inventory search doctrine to be inadequate at its core.  But even assuming the legitimacy of the doctrine's foundations, the "standard procedures" caveat is a fig leaf.  Many police departments' standard inventory-search policies will amount to a direction to search the vehicle whenever it must be impounded, to the fullest extent allowed by law.  As one jurist has commented:  "Police routine cannot be the constitutional touchstone unless we are willing to entrust our liberties to the discretion of the police commissioner."  Moylan, *supra* n.2, at 220.

[30]     *Opperman*, 428 U.S. at 392 (Marshall, J., dissenting).

opportunity to make other arrangements for the safekeeping of his property."[31]  Although giving him "an opportunity to make alternative arrangements would undoubtedly have been possible," the Court declared that it matters not what "could have been achieved"; rather, the question is "whether the Fourth Amendment *requires* such steps . . . ."[32]  Of course, the Court concluded that it was not necessary to allow the owner the opportunity to safeguard his own property, and the owner's consent to the search of his vehicle was not deemed necessary, or even relevant.

It is a strange service indeed whose beneficiary has no choice but to assent.  If given the option, it is safe to surmise that most people would prefer that police officers not rummage through their personal belongings.  Most of us likely would decline such generosity, and would content ourselves with the steps we ordinarily take to secure the contents of a vehicle—rolling up the windows and locking the doors.[33]  Even if a car's owner cannot readily be identified and thus cannot provide consent or voice an objection, it is unreasonable to assume that the owner would gladly accept the forfeiture of his or her constitutional rights in exchange for this uninvited "protection."[34]  The officer's

---

[31]     *Bertine*, 479 U.S. at 373.

[32]     *Id.* at 373-74 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)) (emphasis in original).

[33]     *See, e.g., Mozzetti v. Superior Ct.*, 484 P.2d 84, 89 (Cal. 1971) ("In weighing the necessity of the inventory search as protection of the owner's property against the owner's rights under the Fourth Amendment, we observe that items of value left in an automobile to be stored by the police may be adequately protected merely by rolling up the windows, locking the vehicle doors and returning the keys to the owner.  The owner himself, if required to leave his car temporarily, could do no more to protect his property."); *see also Opperman*, 428 U.S. at 394-95 (Marshall, J., dissenting) (citing *Mozzetti*).

[34]     Moylan, *supra* n.2, at 218 (quoting *Comment,* Chimel v. California: *A Potential Roadblock to Vehicle Searches*, 17 U.C.L.A. L. REV. 626, 641 (1970)) ("It is true that when a car must be impounded the risk that some items will be removed when the car is taken to a garage may still be present.  But even if this small risk does exist, it is unreasonable (continued…)

property-protection service is particularly unwelcome, one might assume, where it results in criminal charges and the incarceration of the supposed beneficiary. As one jurist pithily noted: "The failure to consult the wishes of the individual concerned makes a mockery of the claim that the search is in the interest of protecting his personal property. It would be of small comfort to go to the penitentiary, reassured that you are there only because the police were adamant in protecting you from petty theft regardless of whether you wished such protection."[35]

To the extent that inventory searches offer any "protection of the owner's property," that supposed benefit is offset by the fact that the search constitutes a different kind of harm to the property—unwarranted government intrusion. They are trespasses upon private property, rendering the people *less* "secure in their . . . possessions."[36]

**(b) "Protection of the police against claims or disputes over lost or stolen property"**

Perhaps the most oft-invoked justification for inventory searches is the claim that performing the inventory guards the police officer against claims of theft. It would be one thing if the inventory search did anything to serve this interest. But it does not; indeed, it only increases the risk of such controversies.

There is a legitimate question about whether this is a real problem in the first place. Private towing companies manage to impound cars every day without anyone rummaging through the cars' interiors, and such companies appear to be able to operate despite the potential for disputes over stolen property. Claims against tow truck drivers and impound

---

to think that the owner would exchange Fourth Amendment rights for unwanted protection against theft.").

[35]     *Id.* at 219.

[36]     PA. CONST. art. I, § 8.

lots clearly have not overburdened the legal system or driven these companies into bankruptcy. No one has produced any evidence to suggest that the abolition of inventory searches would lead to a deluge of burdensome claims against police departments for items missing from impounded vehicles. Is the "problem" to which inventory searches purportedly respond even actually a problem, or is it a figment of the judicial imagination?

But let us suspend disbelief and assume for argument's sake that the concern is warranted. The inventory search provides no remedy. All that the search achieves is the production of a written list of items in the vehicle, ostensibly to be later compared with the contents when the vehicle is returned to the owner. This piece of paper proves nothing. The owner could merely claim that the officer stole an item and deliberately left that item out of the inventory. This observation was obvious well before *Opperman*,[37] and even Justice Powell's *Opperman* concurrence noted that inventory searches are not "a completely effective means of discouraging false claims, since there remains the possibility of accompanying such claims with an assertion that an item was stolen prior to the inventory or was intentionally omitted from the police records."[38] The *Opperman* majority mustered no response to Justice Powell's point. It remains to be seen, then, how the preparation of an inventory actually deters even a single claim of theft.

---

[37] *See, e.g.*, *In re One 1965 Econoline, I. D. No. 16JH702043, Ariz. License No. EC-7887*, 495 P.2d 504, 508-09 (Ariz. Ct. App. 1972) ("We fail to see how the taking of an inventory will insulate the police against false accusations of theft and assure the property owner that his property will not be taken. Unscrupulous persons who desire to steal articles will simply not list them on the inventory. Owners who wish to assert spurious claims against law enforcement officers or the garage owners can simply claim that the officers did not list them on the inventory.").

[38] *Opperman*, 428 U.S. at 379 (Powell, J., concurring); *see also id.* at 391 (Marshall, J., dissenting) ("Moreover, as Mr. Justice Powell notes, it may well be doubted that an inventory procedure would in any event work significantly to minimize the frustrations of false claims.") (citation omitted).

Indeed, if the aim is to deter claims of theft against police officers, then performing an inventory search is perhaps the *worst* way to achieve that end. The inventory search places the officer into direct contact with myriad items that otherwise would remain secure inside the vehicle. In conducting the inventory, the officer handles the owner's personal effects, with which the officer otherwise would have no interaction. Interacting with the property in this manner *increases* the possibility that items could be lost or stolen, and only increases the officer's exposure to claims of such. The best defense to a hypothetical claim that the officer stole an item from inside the vehicle is not some self-serving scrap of paper; the best defense rather would be a circumstance in which the officer honestly could say: "I couldn't have stolen it because I never went inside the vehicle."

To that end, as with many areas of search-and-seizure jurisprudence, developments in technology should give us pause about certain assumptions that underlay older judicial decisions.[39] The inventory search doctrine developed long before the widespread proliferation of police body cameras and dashboard cameras. In *Opperman*'s day, a claim of stolen property often may have turned largely or exclusively upon the officer's and claimant's competing accounts. Today, a significant portion of police-citizen interactions are captured in high-quality video and audio from beginning to end. Video footage demonstrating that the officer never searched the interior of the car would be far better evidence of the officer's innocence than any list of items, which may or may not represent the complete contents of the vehicle before the search.

---

[39] *See Gary*, 91 A.3d at 139 (Todd, J., dissenting) (noting the "undeniable fact that our society has undergone a sweeping technological revolution over the many years which have elapsed since the time of the federal decisions on which the [*Gary*] plurality opinion relies, seriously undermining the viability of their use as governing constitutional norms for vehicle searches in our modern society"); *cf. Missouri v. McNeely*, 569 U.S. 141, 155 (2013) (observing that technological developments in the search warrant process are relevant to the assessment of exigent circumstances).

A telling aspect of the protection-against-claims excuse is that inventories are not suggested as a necessary protective measure in many other search contexts. When police officers execute a search warrant inside a home, for example, they encounter many more personal items than are likely to be found inside a car. The officers are responsible for the premises while conducting the search. With more items present, there is even more risk that items could go missing or that the homeowner could accuse an officer of theft. Yet, the law has not seen fit to require police officers to produce a written inventory of every item in the house so that the owner can determine whether anything is missing after the search. Why not? If the asserted interest is so great that it justifies warrantless searches of vehicles without probable cause, then one would expect that the same "problem" would require a similar "solution" elsewhere. Somehow, the criminal legal system appears to function without this "solution."

Simply put, the protection-from-claims rationale—that a police officer must rummage through a person's property in order to assure that person that the officer has not stolen anything—is ludicrous. The far better guarantee of security from the officer's potential theft would be for the officer simply to stay out of the car.

**(c) "Protection of the police from potential danger"**

*Opperman*'s final suggestion is that inventory searches are needed to protect police officers from potential danger. It is difficult even to conceive of the sort of danger that the *Opperman* Court was imagining. Prior to the inventory search, the officer is outside the vehicle. Any potential danger, presumably, is inside the vehicle. What sort of object inside the vehicle poses a danger to the officer, if the officer simply remains outside the vehicle? Most potentially dangerous objects that could lurk inside a vehicle— guns, knives, syringes, etc.—pose no appreciable threat to the officer if the officer simply does not enter the vehicle and attempt to handle them. An explosive device is nearly all

that comes to mind. But it is preposterous to conclude that all vehicles must be subject to inventory searches upon impoundment because there are astronomically low odds that some particular vehicle may be concealing a bomb or the like.

As with the protection-against-claims rationale, performing an inventory search does not advance the cited aim and, indeed, is antithetical to that interest. Any potential danger to the officer from an object inside the vehicle is exacerbated when the officer enters and starts poking around. As Justice Marshall commented: "Not only is protecting the police from dangerous instrumentalities an attenuated justification for most automobile inventory searches, but opening closed containers to inventory the contents can only increase the risk."[40] Justice Marshall compared the suggestion to an analogous comment made by a federal district court judge: "The argument that the search was necessary to avoid a possible booby-trap is . . . easily refuted. No sane individual inspects for booby-traps by simply opening the container."[41] If the concern is that objects inside vehicles could be dangerous to police officers, then their safety would be far better protected by, again, just staying out of the car.

The protection-from-danger rationale is all the more perplexing given the availability of the exigent circumstances exception to the warrant requirement. Both Pennsylvania law and federal law excuse the need for a search warrant where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable."[42] As this Court has noted, "[a]lthough an exigency may present itself in a variety of contexts, its defining trait is a 'compelling need

---

[40]     *Bertine*, 479 U.S. at 384 (Marshall, J., dissenting).

[41]     *Id.* (quoting *United States v. Cooper*, 428 F.Supp. 652, 654-55 (S.D. Ohio 1977)).

[42]     *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)); *see Alexander*, 243 A.3d at 207-09.

for official action and no time to secure a warrant.'"[43] If there is any reason whatsoever to believe that the contents of a specific vehicle pose some sort of danger to a police officer or the public, and if there develops some compelling need for the officer to enter the vehicle in order to abate that danger, then nothing precludes the officer's resort to the exigent circumstances exception. Because this avenue is always available where needed in specific instances, there is simply no need to endorse the inventory search as a categorical rule subjecting all vehicles to pointless intrusions, particularly where the overwhelming majority of such vehicles pose no threat to the officer's safety—or anyone else's—at all.

In his *Opperman* concurrence, Justice Powell remarked: "Except in rare cases, there is little danger associated with impounding unsearched automobiles. But the occasional danger that may exist cannot be discounted entirely."[44] To the contrary, because one must labor even to imagine the nature of this danger, because any such danger is only increased by performing an inventory search, and because this entire exercise is unnecessary in light of the exigent circumstances exception, the hypothetical danger absolutely can, and should, be "discounted entirely."

**IV.**

If constitutional rights are to be curtailed, we must demand better reasons. Inventory searches do not advance any of the interests that they are said to serve; they *harm* those interests. They "protect" property by trespassing upon it. They do nothing to deter or defeat allegations of loss or theft, and they only increase the possibility for loss or theft, both actual and alleged. And they are not responsive to any realistic danger;

---

[43]    *Commonwealth v. Trahey*, 228 A.3d 520, 530 (Pa. 2020) (quoting *McNeely*, 569 U.S. at 149).

[44]    *Opperman*, 428 U.S. at 378 (Powell, J., concurring).

again, they only increase the officer's exposure to whatever hypothetical danger could lurk inside the car. If *Opperman*'s trio of "needs" were truly their purpose, then inventory searches are a tremendous failure, and an utter waste of law enforcement resources.

But of course, inventory searches are not really about those rosy good-government excuses. They excel at precisely one thing: circumventing the search warrant process in an effort to discover evidence of crime. That is why they really exist; it is why law enforcement embraces the authority to conduct them, and it is why the government inexorably defends their legitimacy in appeals from criminal convictions.

The convenient fiction has persisted for a long time now. The true aims of the inventory search have always been apparent from the obvious weakness of the doctrine's justifications. Just a few months before the Supreme Court announced its decision in *Opperman*, then-Judge Charles E. Moylan, Jr., of Maryland's Court of Special Appeals published an article exposing the "intellectual fraud" upon which the inventory search doctrine stands. Judge Moylan offered a cutting summary of the "galling gap between the pose of the police and what one instinctively knows is their true purpose," commenting:

> The fairy tale would have us believe that the police are interested solely and exclusively in safeguarding personal property and are naively surprised when their "safeguarding" efforts turn up evidence of crime. The strange thing about the "safeguarding" is that no effort is ever made to have the arrested driver lock the vehicle and park it in a safe place to his own satisfaction . . . or to inquire of the arrested driver in any way as to his wish, with respect to his non-suspect property. Universally, the police studiously avoid all such "safeguarding" alternatives and resort to the single mode of "safeguarding," that also incidentally permits them to get a good look at the interior of the car and its contents, even when this mode is far from the most convenient. The notion that the criminal evidence they then turn up amounts to no more than an unexpected boon strains credulity. A law that permits the police frankly and openly to tear a car apart for possible criminal evidence when a driver is arrested would not be as offensive as the patent intellectual fraud underlying the "inventory" rationale. Everyone knows the

real purpose, but police, prosecutors and judges alike play their assigned roles with absolutely straight faces.[45]

Judge Moylan published that piece in the spring of 1976. That summer, the Court decided *Opperman*, and the inventory search—flimsy excuses and all—became the law of the land under the Fourth Amendment. But *Opperman*'s vintage does not make its rationale any more compelling. Fine wine this is not. While the law has grown accustomed to inventory searches, it has never found an adequate justification for them.

When we are applying the law of the Fourth Amendment, we are bound by *Opperman*, and we must dutifully recite its baffling rationale. But our own Constitution is not shackled by federal folly. Under Article I, Section 8 of Pennsylvania's Constitution, we can and do embrace greater protections of privacy rights than federal doctrine would allow, and, per *Alexander*, we already have made that determination with respect to people's vehicles.[46] Inventory searches are destructive of those privacy rights, and they achieve nothing worthwhile. Our Constitution and our citizens demand better than *Opperman*'s hand-waving excuses. The people are entitled to meaningful protection of their possessions. Because there is no good reason to perform inventory searches, they are "unreasonable searches" under Article I, Section 8 of the Pennsylvania Constitution.

\* \* \* \*

When a police officer faces a situation in which a vehicle must be impounded, my proposed constitutional rule is straightforward and simple: (1) Don't search the car; (2) Lock it; then (3) Just have it towed to the impound lot.

---

[45]     Moylan, *supra* n.2, at 209-10.

[46]     *See Alexander*, 243 A.3d at 181 ("[W]e hold that Article I, Section 8 affords greater protection to our citizens than the Fourth Amendment, and reaffirm our prior decisions: the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile.").

This rule has numerous advantages over the inventory search. It is simple. It is predictable. It requires no time-consuming procedure. It does not require the police department to develop uniform, standard practices. It allows the officer to dedicate valuable law enforcement resources to more worthwhile tasks. It provides the best defense to a hypothetical claim of theft of an item from the car. It does not needlessly expose the officer to any potential danger inside the car. Most importantly, it respects the owner's privacy rights in the car.

There is no reason to continue to allow inventory searches, and there is no reason to dismiss this appeal. I would reverse the order of the Superior Court, and would declare that inventory searches violate Article I, Section 8 of the Pennsylvania Constitution.

I respectfully dissent.